# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *In re Haley D.*, 2011 IL 110886

---

| | |
|---|---|
| Caption in Supreme Court: | *In re* HALEY D. (The People of the State of Illinois, Appellant, v. Ralph L., Appellee). |
| Docket No. | 110886 |
| Filed | December 1, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A father not in default in neglect proceedings should have been served when a petition to terminate parental rights was later filed, and, where he was not and was defaulted when he missed a hearing, his motion to set this nonfinal default aside should have been granted–parental rights termination vacated and due process issues not reached. |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Du Page County, the Hon. Thomas J. Riggs, Judge, presiding. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Joseph E. Birkett, State's Attorney, of Wheaton (Michael A. Scodro, Solicitor General, and Brett E. Legner, Assistant Attorney General, of Chicago, and Patrick Delfino, Lawrence M. Bauer and David A. Bernhard, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People. |
| | Michael V. Ohlman, Forrest L. Ingram and Philip Groben of Chicago, for appellee. |
| | Robert F. Harris, Kass A. Plain and Christopher Williams, of the Office of the Cook County Public Guardian, of Chicago, for *amicus curiae* Cook County Public Guardian. |
| Justices | JUSTICE KARMEIER delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Freeman, Thomas, and Burke concurred in the judgment and opinion. |
| | Justice Theis specially concurred, with opinion, joined by Justice Garman. |

## OPINION

¶ 1      The central issue in this case is whether the circuit court of Du Page County erred when it denied Ralph L.'s motion to set aside a finding that he had defaulted on a petition by the State to terminate his parental rights to his daughter, Haley D., and entered a default judgment terminating Ralph's parental rights over the child. The appellate court held that the proceedings did not comport with due process requirements because the State had made no attempt to serve Ralph with the termination petition and the court ruled against him on that petition despite the absence of proof that an attempt at service had been made. Condemning the entry of default judgment against Ralph as "unfair, unjust and unconscionable," the appellate court reversed the circuit court's order denying Ralph's motion to set aside the default, vacated the default judgment, and remanded the cause to the circuit court for further proceedings. 403 Ill. App. 3d 370. One justice dissented. We subsequently granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). We also allowed the Cook County public guardian to file a friend of the court brief supporting the State's position. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010). We now affirm the appellate court's judgment, though for reasons different from those on which the appellate court relied.

¶ 2                                                    BACKGROUND

¶ 3          Haley D. is the youngest of six children born to Ralph L. and Patricia D.[1] At the time of
her birth in April of 2007, Haley exhibited symptoms of drug withdrawal and was discovered
to have been exposed to cocaine *in utero*. A drug test administered to her mother, Patricia
D., confirmed the presence of cocaine in Patricia's system.

¶ 4          Because she was undergoing withdrawal, Haley was kept in the hospital for six days.
When she was set to be released, the State took her into protective custody and placed her
in a foster home. It also filed a petition in the circuit court of Du Page County pursuant to
section 2-13 of the Juvenile Court Act of 1987 (705 ILCS 405/2-13 (West 2008)) alleging
that she was a neglected minor and asking that she be made a ward of the court. The basis
for the charge of neglect was that, at the time of her birth, her blood, urine or meconium
contained a controlled substance (cocaine) which was not the result of medical treatment
administered to her or her mother. See 705 ILCS 405/2-3(1)(c) (West 2008).

¶ 5          When it filed its petition, the State did not ask the court to terminate the parental rights
of either Ralph or Patricia. Had termination of parental rights been its objective, the State
would have been required to say so "clearly and obviously" in its prayer for relief. 705 ILCS
405/2-13(4) (West 2008). No such declaration was made. Instead, the State elected to make
a general prayer for relief without specifying any proposed disposition following adjudication
of wardship. See 705 ILCS 405/2-13(3) (West 2008).

¶ 6          Patricia and Ralph did not live together. Patricia was personally served with the petition.
Abode service was made on Ralph by leaving the summons and a copy of the petition with
his mother at the house they shared. There is no dispute that service on both Patricia and
Ralph complied with the requirements of section 2-15 of the Juvenile Court Act of 1987 (705
ILCS 405/2-15 (West 2008)), which governed service of summons with respect to the State's
petition.

¶ 7          Once service was accomplished and separate public defenders were appointed to
represent Ralph and Patricia, the court held an adjudicatory hearing. Following that hearing,
the court entered a finding that Haley was neglected within the meaning of section 2-3(1)(c)
of the Juvenile Court Act (705 ILCS 405/2-3(1)(c) (West 2006)) as the State had alleged. The
order containing the court's finding was filed July 31, 2007.[2]

¶ 8          A dispositional hearing was conducted by the court two weeks later, on August 14, 2007.

_____

[1]Four of the children reside with Ralph, who has maintained physical custody of them
throughout these proceedings. The youngest is approximately 4, the oldest around 13. The couple's
fifth child died in infancy as the result of complications related to pneumonia. Ralph also has a son
from a previous relationship, who is now approximately 16 years of age. Ralph works full time. His
mother, who lives with Ralph and the children, assists him with child care.

[2]The court had issued a similar order three weeks earlier, entering a default against Ralph
when he failed to appear for the hearing. That order was set aside, however, after Ralph's attorney
promptly moved to vacate the order, explaining that Ralph had been absent only because his car had
a flat tire while he was on his way to the courthouse, a problem which he immediately telephoned
his caseworker to report.

See 705 ILCS 405/2-22 (West 2008). Based on the evidence presented at that hearing, the circuit court entered an order making Haley a ward of the court and setting as the permanency goal the return of Haley to her parents within 12 months. The court also approved a service plan formulated by the Department of Children and Family Services (DCFS) and scheduled a permanency hearing for February 12, 2008. That date was subsequently reset for February 19, 2008.

¶ 9 By the time of the February 19, 2008, hearing, Patricia's whereabouts were unknown and the court determined that she had not made substantial progress toward having Haley return home. Although reports submitted to the court indicated that Ralph had not been complying with the service plan which had been established for him and a recommendation had been made that the permanency goal be changed, the court rejected that recommendation. Based on the evidence presented to it, the court concluded that Ralph had been making substantial progress toward Haley's return home and continued to set as the permanency goal Haley's return home within 12 months.

¶ 10 An assessment prepared by DCFS in August of 2008 stated that Ralph's progress was "less than ideal" because he was tardy for or had cancelled visits with Haley, but also noted that he had participated in "parent coaching" throughout the previous quarter and made significant improvements. According to the assessment, Ralph's family was stable "due to good money management by [Ralph, who] has continued with the same employer for twelve years," and the family home appeared "clean, safe and appropriate for the children living there." Ralph was also described as "invested in the lives of his 5 oldest children and provides support and nuturance [*sic*] to them."

¶ 11 A report prepared by the parenting coach to whom Ralph had been referred stated that during the period between June 16, 2008, and August 15, 2008, Ralph had attended 9 of 13 scheduled parent coaching sessions. The report stated that he "continues to be prepared and eager for the sessions to occur," but occasionally arrives late. At the time the report was drafted, Ralph had not yet developed "a clear understanding of all the techniques that have been introduced to him," and the report complained of inconsistencies with the coaching sessions. At the same time, however, the report noted that "[h]e has been very cooperative, open, willing to grow and try new techniques to become a better parent" and that "[r]ecently, since Haley and [he] have grown comfortable with one another, he has started working with this coach to further develop his skills by including the other children in the sessions."

¶ 12 According to DCFS, there were only two areas in which Ralph's progress was deemed unsatisfactory. First, due to prior incidents involving Patricia, he was supposed to complete a domestic violence assessment and undergo a mental health assessment. Second, because of a history of drug-related problems in the household, he was also supposed to complete a substance abuse evaluation and submit to random drug tests. The reports show that he was not in compliance with those requirements. He had also been remiss in obtaining developmental evaluations from the local school district for two of his other children. Overall, however, DCFS reported that Ralph's progress was satisfactory and that the previously established outcome should be maintained.

¶ 13 The Evangelical Child & Family Agency (ECFA), which had become involved in the

case under DCFS's auspices, also made a report around this time. In detailing the family's status and history, it noted that Ralph had filed for divorce from Patricia and that, according to Ralph, the divorce was now finalized. The report contained observations consistent with the other reports filed with the court, including the need for Ralph to comply with the random drug screening requirement in order to confirm that he was abstaining from substance abuse, as he claimed; the desirability of his obtaining a domestic violence assessment and participating in mental health counseling; and the need for him to improve his parenting skills and be more consistent in attending his scheduled visits with Haley. It did not, however, recommend a change in the permanency goal. It opined that return of Haley to the home within 12 months should remain the goal "in order to allow Ralph L[.] and/or Patricia L[.] adequate time to complete reunification services."

¶ 14        The record is clear that, by the end of August 2008, Patricia had no involvement with Haley and was making no effort to comply with the permanency goal set by the court. Accordingly, in an interim order entered in September of 2008, the court found that Patricia was no longer making substantial progress toward Haley's return home. Notwithstanding the positive developments contained in the reports just described, the court made the same determination with respect to Ralph. It did not, however, alter the permanency goal, which remained for Haley to return home within 12 months.

¶ 15        The following month, the foster parents who had been caring for Haley sought leave to intervene in the proceedings pursuant to section 1-5(2)(d) of the Juvenile Court Act (705 ILCS 405/1-5(2)(d) (West 2006)). In addition, ECFA filed a report with the court which indicated that Ralph had failed to follow through with a domestic violence program and had still not cooperated with drug screens. Based on these two problems, the report opined that Ralph had "not made it a priority for Hailey [*sic*] to be returned to his care, as demonstrated by his lack of participation in services," and recommended that the permanency goal be changed to substitute care pending termination of parental rights.

¶ 16        A hearing was convened by the court on October 14, 2008, at which Ralph was present. He was not represented by counsel. The previous month he had indicated to the court that he wished to obtain private counsel to replace his appointed public defender. The court promptly granted the public defender leave to withdraw from the case, but Ralph had not yet found replacement counsel by the time of this hearing.

¶ 17        Although Ralph did not dispute that he had not followed through with the domestic violence program or appeared for the drug screenings as set forth in ECFA's report, he objected to that agency's recommendation that the permanency goal be substitute care until a determination could be made as to whether his parental rights should be terminated. Speaking on his own behalf, Ralph argued to the court that his inability to comply with the requirements of the service plan, including requirements that he undergo random drug tests, was due to the fact that he was extremely busy at work and had other children at home for whose care he was responsible.

¶ 18        After listening to Ralph, the court advised him in open court that it was granting leave to the State to file a petition to terminate his parental rights and that he would risk termination of his parental rights if he failed to comply with the terms of the service plan and

correct the conditions which had necessitated Haley's placement with foster parents. The court then entered a written order allowing the foster parents to intervene in the proceedings, changing the permanency goal to substitute care pending termination of parental rights, and granting the State leave to file a petition to terminate those parental rights.

¶ 19     Approximately four months later, on February 5, 2009, the State filed a formal petition to terminate Ralph's and Patricia's parental rights and to grant Haley's guardian the power to consent to her adoption. Such proceedings are governed by section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2008)). Petitions brought under section 2-29 must contain an allegation that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2008)) and include the specific statutory grounds on which the charge of unfitness is based. *In re Gwynne P*., 215 Ill. 2d 340, 349 (2005). Numerous grounds were alleged by the State with respect to Patricia. As for Ralph, the State averred that he was unfit for just two reasons: (1) because he had "failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent within nine (9) months after an adjudication of NEGLECTED MINOR under the Juvenile Court Act of 1987 [see 705 ILCS 405/2-3 (West 2008)] (750 ILCS 50/1(D)(m)) from 8-14-07 through 5-14-08," and (2) because he had failed "to make reasonable progress toward the return of the child to the parent within 9 months after [the child had been adjudicated a] NEGLECTED MINOR, under the Juvenile Court Act of 1987 [see 705 ILCS 405/2-3 (West 2008)] (750 ILCS 50/1(D)(m)) from 8-14-07 through 5-14-08."

¶ 20     When the State filed its initial petition under section 2-13 of the Juvenile Court Act of 1987 (705 ILCS 405/2-13 (West 2008)) alleging that Haley was a neglected minor and asking that she be made a ward of the court, the summons served on Patricia and Ralph had contained a notice, required by section 2-15(3) of the Juvenile Court Act (705 ILCS 405/2-15(3) (West 2008)), that the "parties will not be entitled to receive further written notices [or] publication *** notices of proceedings in this case, including the filing of an amended petition or a motion to terminate parental rights, except as required by Supreme Court Rule 11."

¶ 21     Supreme Court Rule 11 addresses the "Manner of Serving Papers Other Than Process and Complaint on Parties Not in Default in the Trial and Reviewing Courts." Ill. S. Ct. R. 11 (eff. Dec. 29, 2009). Paragraph (a) of Rule 11 identifies on whom service must be made (a party's attorney of record, otherwise, the party); paragraph (b) identifies methods of service (personal delivery, use of the postal service or a third-party commercial carrier, or via facsimile transmission); and paragraph (c) sets forth service requirements where a case involves multiple parties or attorneys. Ill. S. Ct. R. 11 (eff. Dec. 29, 2009).

¶ 22     When the State subsequently filed its formal petition to terminate Ralph's and Patricia's parental rights and to grant Haley's guardian the power to consent to her adoption, it did not comply with the provisions of Rule 11. The petition was not delivered to any of the persons identified in the rule by any of the methods the rule permits. In addition, the State filed nothing to indicate when it intended to seek a hearing on the petition.

¶ 23     On February 17, 2009, the court conducted another hearing on the parents' progress toward meeting the permanency goal. Various attorneys were present, including Patricia's

-6-

attorney. Ralph was not in attendance and had not yet retained a new attorney to represent him.

¶ 24    At the conclusion of that hearing, the court entered a written order changing the permanency goal to termination. The order also continued the case to April 14, 2009. The order specified that this was to be a permanency hearing in connection with the underlying neglect proceeding. There was no indication that the petition to terminate and to authorize the guardian to consent to adoption would also be taken up. To the contrary, the box on the order form which referenced the termination petition was left unchecked.

¶ 25    Following entry of the February 17 order, the State made its first and only attempt to personally serve Patricia with the petition to terminate and to authorize the guardian to consent to adoption. The summons, dated February 20, set the hearing date on the petition for April 14, the same day as the previously scheduled permanency hearing. The record shows that the paperwork was received by the sheriff on February 26 and that a sheriff's deputy attempted to serve Patricia with the summons and petition to terminate on the morning of February 28. The attempt was unsuccessful, and the summons was returned unserved with the explanation that Patricia's mother had told the deputy that Patricia had moved to Chicago and was in "rehab."

¶ 26    In the meantime, Patricia's appointed attorney moved for leave to withdraw from the case. The basis for that motion was that Patricia had never responded to any of the attorney's communications, repeatedly failed to appear at court hearings, and otherwise refused to cooperate with counsel, thus preventing the attorney from properly representing her.

¶ 27    After the State's attempt to serve Patricia personally failed, it resorted to serving her by publication. Specifically, it arranged for notice of the April 14 setting on the petition to terminate and to authorize the guardian to consent to adoption to be published in the Daily Herald newspaper on March 3, 10, and 17, 2009. Pursuant to section 2-16(2) of the Juvenile Court Act (705 ILCS 405/2-16(2) (West 2008)), the State supported its use of service by publication with an affidavit, which it filed with the court, addressing the steps which had been taken to locate Patricia and the reasons why process could not be served on her either personally or by mail.[3]

¶ 28    Patricia was the only respondent identified in the State's affidavit. No mention was made of Ralph, directly or indirectly. There was also no evidence in the record that the State ever filed an affidavit specifically directed to Ralph pursuant to section 2-16 of the Juvenile Court Act (705 ILCS 405/2-16 (West 2008)). Such an affidavit could not, in fact, have been prepared with respect to Ralph, for there was never any uncertainty as to his place of

---

[3]Service by publication is not permissible under section 2-16 absent a diligent search to locate the parents first. In this case, the assistant State's Attorney who submitted the affidavit did swear that Patricia could not be located despite diligent efforts to find her. He so attested, however, on February 19. That was five days before Patricia's lawyer filed her motion to withdraw from the case outlining the problems she had experienced in communicating with Patricia, a full week before the summons was even received by the sheriff's office and nine days before the summons was returned by the sheriff with the notation that Patricia had moved.

residence, nor was there any evidence of any other legally cognizable impediment to serving him personally. Indeed, there is no evidence that personal service on Ralph was even attempted.

¶ 29 The April 14 hearing proceeded as scheduled. Because Patricia appeared, her attorney sought and was granted leave to withdraw her motion to withdraw from the case. At counsel's request, the court gave Patricia additional time, to May 12, to answer the State's petition to terminate. With respect to Ralph, matters proceeded differently. When the court observed that Ralph was not present, he asked the assistant State's Attorney where the case stood "vis-a-vis the natural father." The assistant State's Attorney replied:

"Your Honor, I believe we have service on him. I'm looking for it, though. I know we've attempted service, your Honor. I'm just looking for proof of that.

* * *

I have found proof, obviously, of the natural mother's service. If not–I don't see a receipt, your Honor, although I do see numerous–[.]"

¶ 30 The reason the assistant State's Attorney could find no documentation in the record regarding service on Ralph is that, as we have just indicated, there was none. At this juncture, however, the court pointed out that "[t]here has been publication concerning the petition to terminate parental rights." The assistant State's Attorney responded by asking that Ralph "be defaulted" and that the "prove up" of the default be set for hearing on the same date, four weeks hence, when Patricia's answer was due on the petition for termination and for authorization for the guardian to consent to adoption. The request by the assistant State's Attorney was granted. The same day, April 14, 2009, the court filed a written order noting that "natural father failed to appear and is defaulted" and continuing the case until May 12 "for answer and setting."

¶ 31 In relying on the service by publication regarding Patricia as being sufficient to achieve service on Ralph and support entry of a finding of default against him, the trial judge overlooked the affidavit requirements described above. He also failed to heed one of his circuit's own local rules. Under Eighteenth Judicial Circuit Local Rule 21.09(a) (18th Judicial Cir. Ct. R. 21.09(a) (July 16, 2008)), counsel seeking an order of default terminating a person's parental rights must file a supporting affidavit "establishing factually the action taken that demonstrates honest and well directed efforts to ascertain the whereabouts *of the person sought to be defaulted by such service.*" (Emphasis added.) No such affidavit was on file with respect to Ralph.

¶ 32 At the May 12 hearing, Patricia appeared through counsel and was granted additional time, to June 2, to answer the State's petition. Ralph appeared in person and with a new attorney, Diana Vizcaino, who filed her appearance that day. Ralph's new attorney advised the court of her intention to file a motion to have the default set aside, and the court granted her additional time to do so. The court did so over the objection of the State, which had also

objected, unsuccessfully, to giving Patricia additional time to answer the petition.[4] The court set the hearing on Ralph's motion to vacate the default for the same time as the June 2 hearing on Patricia's answer.

¶ 33 On June 1, within the time allowed by the court, Ralph, through counsel, duly filed a motion to have the default set aside pursuant to section 2-1301(e) of the Code of Civil Procedure (Code) (735 ILCS 5/2-1301(e) (West 2008)). At the previously scheduled June 2 hearing, the court deferred consideration of Ralph's motion until June 30. It did, however, proceed to the merits of the State's request to terminate Patricia's parental rights. After hearing testimony and argument, the court found that Patricia was an unfit parent as alleged by the State in its petition for termination of her parental rights. Without objection, the court then proceeded to the question of whether it was in Haley's best interests that Patricia's parental rights be terminated. It answered that question in the affirmative.

¶ 34 The record does not include a transcript of the next hearing, which took place as scheduled on June 30. The record shows only that a written order was entered at the conclusion of the hearing. The order granted the State 10 days to file a motion to strike Ralph's motion to vacate the court's default order and established a schedule for Ralph to respond and for the State to reply to Ralph's response. The court also granted a request by the public defender's office for leave to withdraw from the case as counsel for Patricia, and set the next hearing date for September 1, 2009.

¶ 35 More than two weeks after the 10-day deadline specified in the court's order of June 30, the State filed a written motion asking the court to strike Ralph's motion to vacate. As grounds for that motion, the State argued that Ralph's motion did not comply with the time requirements set forth in section 2-1301(e) of the Code and that, for this reason, the circuit court no longer had jurisdiction to consider it.

¶ 36 By order dated September 1, 2009, the court granted a request by Ralph's attorney for additional time to respond to the State's motion to strike. When Ralph's attorney suffered a relapse of a serious neurological condition, she made a second request for additional response time. A hearing was then held on October 6, 2009, at the conclusion of which the court ruled that it would permit Ralph to challenge the default by filing a motion pursuant to section 2-1401 of the Code (735 ILCS 5/2-1401 (West 2008)), continued the matter for hearing until the following December, and denied Ralph visitation with Haley during the interim.

¶ 37 On October 14, within the time set forth by the court in its order of October 6, Ralph filed a new motion to set aside the default entered against him by the court on April 14. The motion cited various provisions of the Code of Civil Procedure (735 ILCS 5/1-101 *et seq.* (West 2008)), including sections 2-608 (counterclaims), 2-613 (separate counts and defenses), and 2-1401 (relief from judgments). It also invoked section 20b of the Adoption Act (750 ILCS 50/20b (West 2008) (one-year time limit on requests for relief from final

---

[4]The State predicated its objection to both requests for additional time on a desire to obtain permanent placement for Haley as quickly as possible. It did not question the circuit court's authority to grant the parents more time.

judgments or orders in Adoption Act cases where such requests are made more than 30 days following entry of the final judgment or order)).

¶ 38    The substantive basis for Ralph's motion was straightforward. It explained that Ralph's absence from the April 14 hearing was not deliberate.[5] Rather, he failed to appear for two separate reasons: (1) he was responsible for his four other living children and had difficulty finding help to care for them on the date in question and (2) his automobile had a flat tire. Both claims were supported by Ralph's affidavit.

¶ 39    Ralph's motion further asserted that he had been diligent in attending previous court hearings. It also explained that Ralph's counsel of record suffered from episodic symptoms of multiple sclerosis. According to the motion, which was substantiated by counsel's own affidavit, the illness had prevented her from challenging the default more expeditiously and had, in fact, required her to contract with another attorney to draft legal documents, including this motion to vacate.

¶ 40    The State filed a written response to Ralph's motion. In that response, it did not dispute the factual claims made by Ralph or his attorney regarding the circumstances surrounding Ralph's failure to appear at the April 14 hearing. Rather, it argued that the motion should be denied because Ralph had failed to offer a meritorious defense to the substantive claims made by the State in its petition to terminate.

¶ 41    The State's response also addressed the issue of whether Ralph had been served with the petition to terminate which culminated in the challenged finding of default. The response, which was prepared by the same assistant State's Attorney who had addressed the service issues earlier in the case, now claimed that on March 9, 2009, the State had attempted to personally serve Ralph, but was unsuccessful. As noted earlier in this opinion, this was untrue. The record contains no evidence to substantiate that anyone ever attempted to serve Ralph with the petition to terminate, and the assistant State's Attorney was unable to proffer anything to support his representation even after it was directly challenged by Ralph's attorney.

¶ 42    Finally, the State's response concluded with the assertion that Ralph had not shown due diligence in challenging the entry of default because "he waited more than 45 days before taking any action in response to [the court's action] on April 14, 2009," finding him in default. This was also incorrect. As detailed earlier in this opinion, Ralph and his new attorney appeared at the very next hearing date in the case, which was on May 12, 2009, only 28 days after the court's April 14 order. At that time, Ralph's counsel expressly advised the court of her desire to have the default finding set aside, and the court granted her additional time to file her formal motion requesting such relief. The motion was subsequently filed within the time frame set by the court.

¶ 43    A hearing on Ralph's motion to vacate was held on December 1, 2009. After listening to counsel's arguments and permitting Ralph to make a statement, the court denied Ralph's request to set aside its April 14 order finding him in default. In explaining the basis for its

---

[5]In the documents submitted to the court, the hearing date was mistakenly listed as April 15, rather than April 14. It is apparent from the record that this was an inadvertent error.

decision, the court noted, *inter alia*, that on "February 17, 2009, the State asked for and was granted leave to publish upon natural father concerning the petition to terminate parental rights as personal service had not been accomplished." The court then went on to state that on April 14, Ralph "was defaulted on the petition to terminate parental rights, and the matter was set for prove-up on May 12 of '09 and prove up did in fact take place."

¶ 44   While the court was correct that it "defaulted" Ralph on April 14, the record contains neither a written motion nor a transcript showing a verbal motion by the State requesting leave to serve Ralph with the petition to terminate and to authorize the guardian to consent to adoption on February 17 or at any other time.[6] The record shows only that the State filed an affidavit for service by publication, the affidavit was filed on February 20, 2009, and, by its terms, it pertained solely to Patricia. Moreover, while a "prove-up" was subsequently conducted, it took place on June 2, 2009, not May 12, and, once again, related exclusively to Patricia.

¶ 45   In any event, the court went on to opine that because Ralph's motion to vacate failed "to set forth any facts to establish a meritorious defense to the underlying petition to terminate parental rights" and did not "allege any facts whatsoever establishing due diligence in pursuing the defense, if any, to the petition to terminate parental rights," it was going to deny Ralph's motion to have the default set aside and that the default would be allowed to stand.

¶ 46   Ralph's attorney moved for leave to file an amended motion. The court denied that request and ordered Ralph from the courtroom on the grounds that he was no longer a party and had no right to be present.[7] Discussion was then held regarding (1) the steps necessary

---

[6]As discussed earlier in this opinion, February 17, 2009, was the date on which one of the permanency review hearings was conducted. In terms of documentation relevant to that hearing, the record contains little more than a report prepared for the hearing by ECFA and dated February 3, 2009. Handwritten notes on the report indicate that the report's recommendations were approved, but the author of the notes is not indicated, they do not contain the trial judge's signature, and, in any case, they have nothing to do with service of process. The written order entered by the court at the conclusion of the hearing was also silent on the question of service of process. We note, moreover, that court approval for service by publication is not required by either the local rules of the 18th Judicial Circuit or by section 2-16 of the Juvenile Court Act (705 ILCS 405/2-16 (West 2008)) before publication service may be undertaken, so it is unclear why such a request would even have been made. Though handwritten minute entries for February 17 do make reference to "leave to publish" with respect to the "N/f [presumably, natural father]," such entries "do not form any part of the official records of the court" even when made by the trial judge upon his own docket (see *People v. Kamrowski*, 412 Ill. 383, 387 (1952)). Such entries may be helpful to the clerk in preparing the record (see *Kamrowski*, 412 Ill. at 387), but they cannot trump what the actual record shows (see, *e.g.*, *People v. Land*, 178 Ill. App. 3d 251, 256 (1988)). Given what is shown by the record here and by what later transpired, it appears that if there were in fact some discussion of service by publication on February 17, it concerned the natural mother, not Ralph, and the reference to the "N/f" was an error.

[7]The trial court offered no legal basis for this action and it was improper. Ralph remained a "party respondent" in this proceeding and had the right to be present. 705 ILCS 405/1-5(1) (West

to formally change the permanency goal for Haley to adoption and (2) the absence of a written order in the record formally terminating Patricia's parental rights. At the conclusion of the hearing, the court entered a written order memorializing its denial of Ralph's motion to vacate the default and denying his motion for leave to file an amended motion to vacate. The order further declared that Ralph's parental rights were terminated and that the court then considered the order to be final and appealable. Simultaneously, the court entered a separate order, dated December 1, 2009, stating:

> "(1) natural father's 735 ILCS 5/2-1401 motion to vacate default judgment is denied. Oral findings are made of record.
>
> (2) the entry of default against the Natural Father of 4-14-09 shall stand over objection of attorneys for natural father.
>
> (3) Per the record of 6-2-09, both the natural father Ralph L[.] and natural mother Patricia *** are unfit parents, furthermore the court finds that it is in the best interest of the minor that both parents' rights are permanently terminated nunc pro tunc to 6-02-09."[8]

¶ 47    Ralph promptly filed his notice of appeal, arguing that the circuit court erred in denying his motion to vacate the finding of default entered against him on the State's petition to terminate his parental rights, that the circuit court's judgment terminating his parental rights should be reversed and that the cause should be remanded to the circuit court for further proceedings.[9] In support of his position, Ralph asserted, *inter alia*, that the State's failure to serve him with the petition to terminate deprived the circuit court of personal jurisdiction. Because the court lacked personal jurisdiction, Ralph contended that its subsequent order terminating his parental rights was void *ab initio*.

---

2008).

[8]This aspect of the court's order was also improper. Use of *nunc pro tunc* orders or judgments is limited to incorporating into the record something which was actually previously done by the court but inadvertently omitted by clerical error. *People v. Melchor*, 226 Ill. 2d 24, 32-33 (2007). In this case, as we have just noted, the hearing on June 2 reached the merits of the State's claims only with respect to Patricia. The evidence presented pertained to Patricia, not Ralph, and the State's request was that Patricia be declared unfit and that Patricia's parental rights be terminated. There was no discussion of the ultimate resolution of Ralph's fitness or rights because, at that time, his motion to vacate the finding of default remained pending. Since the merits of the State's claim against Ralph were not, in fact, addressed or resolved by the court at the June 2, 2009, hearing, the circuit court could not use a *nunc pro tunc* order to hold otherwise.

[9]The circuit court's December 1 order did not address the other relief sought by the State in its petition, namely, that Haley's guardian be authorized to consent to her adoption. The pendency of that issue, however, was not a bar to Ralph's appeal. Once the circuit court entered its December 1 order terminating Ralph's and Patricia's parental rights, Ralph was entitled to bring an interlocutory appeal as a matter of right to challenge the termination. Ill. S. Ct. R. 307(a)(6) (eff. Feb. 26, 2010).

¶ 48    The appellate court rejected that argument, reasoning that once Ralph was served with process in the initial neglect proceeding, the court retained personal jurisdiction over him throughout the remainder of the case. 403 Ill. App. 3d at 374-75. It held, however, that under section 15-3 of the Juvenile Court Act (705 ILCS 405/2-15(3) (West 2008)), the State had a continuing obligation to notify him of subsequent filings in the case as provided by Supreme Court Rule 11, which, as described earlier in this opinion, governs the "Manner of Serving Papers Other Than Process and Complaint on Parties Not in Default in the Trial and Reviewing Courts." Ill. S. Ct. R. 11 (eff. Dec. 29, 2009).

¶ 49    The appellate court held that the State had failed to meet that obligation. Indeed, noted the court, the State had made no attempt to give Ralph any notice of the filing of the petition to terminate his parental rights. While this lack of notice did not deprive the trial court of jurisdiction over him, the appellate court opined that the procedures (or lack of procedures) followed in this case offended due process. "The principle that parents possess the fundamental right to make decisions about the care, custody, and control of their children without unwarranted state intrusion" was, the court observed, " 'embedded in our jurisprudence.' *In re Sophia G.L.*, 229 Ill. 2d 143, 171 (2008)." 403 Ill. App. 3d at 376. Noting that the interest of parents in the care, custody, and control of their children is one of the oldest of the fundamental liberty interests recognized, the court held that this interest is protected by the due process clause, and that the procedures involved in terminating parental rights must comply with the requirement of procedural due process. "Fairness is the core meaning of due process," the court held, but in its view the procedures here were anything but fair. 403 Ill. App. 3d at 376. Wrote the court,

"These termination proceedings started improperly when the State never even attempted to serve Ralph with notice of the petition. Things only got worse when, on April 14, 2009, the court granted the default judgment even as the State dug through its records and could not find any proof of an attempt to serve Ralph. The default judgment entered against Ralph was unfair, unjust, and unconscionable [citation] and cannot be allowed to stand. Due process does not allow parental rights to be terminated via such slipshod and unfair proceedings." 403 Ill. App. 3d at 377-78.

¶ 50    The court therefore concluded that Ralph's motion to set aside the finding of default should not have been denied, that the circuit court's judgment terminating his parental rights must be vacated, and that the cause should be remanded to the circuit court for further proceedings. 403 Ill. App. 3d at 378.

¶ 51    One justice dissented. In her view, the lack of notice did not render the circuit court's judgment void, and because it was not void, it should not be set aside without an additional showing by Ralph that he had a meritorious defense and had exercised due diligence in asserting that defense. 403 Ill. App. 3d at 381-82 (Zenoff, P.J., dissenting).

¶ 52    The State subsequently petitioned our court for leave to appeal (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), which we allowed.


¶ 53                                    ANALYSIS

¶ 54    As indicated at the outset of our opinion, and as recognized by the appellate court, the

threshold question in this case is whether the circuit court erred when it denied Ralph's motion to set aside a finding that he had defaulted on a petition by the State to terminate his parental rights to his daughter Haley. In concluding that the circuit court did err, the appellate court relied on constitutional due process principles. For reasons we shall now undertake to explain, we agree with the appellate court's ultimate disposition of the case. In our view, however, that result does not depend on constitutional protections. Because the case can be decided on nonconstitutional grounds, our analysis shall be confined to those grounds, for it is well established that constitutional principles should be addressed only as a last resort, when a case cannot be resolved any other way. *People v. Hampton*, 225 Ill. 2d 238, 243-44 (2007); *Beahringer v. Page*, 204 Ill. 2d 363, 370 (2003).

¶ 55    The Code of Civil Procedure contains two different provisions which pertain to the right of litigants to challenge orders and judgments entered against them by default: section 2-1301(e) (735 ILCS 5/2-1301(e) (West 2008)) and section 2-1401(a) (735 ILCS 5/2-1401(a) (West 2008)). Both provision were employed by Ralph in this case.

¶ 56    Section 2-1301(e) states:

> "The court may in its discretion, before final order or judgment, set aside any default, and may on motion filed within 30 days after entry thereof set aside any final order or judgment upon any terms and conditions that shall be reasonable." 735 ILCS 5/2-1301(e) (West 2008).

Under section 2-1401(a),

> "Relief from final orders and judgments, after 30 days from the entry thereof, may be had upon petition as provided in this Section." 735 ILCS 5/2-1401(a) (West 2008).

¶ 57    The substantive standards applicable to these two statutes are different. Where a litigant seeks to set aside a default under section 2-1301(e), which governs before final judgment has been entered or within 30 days thereafter, the litigant need not necessarily show the existence of a meritorious defense and a reasonable excuse for not having timely asserted such defense. See *Stotlar Drug Co. v. Marlow*, 239 Ill. App. 3d 726, 728 (1993). Rather, the overriding consideration is simply whether or not substantial justice is being done between the litigants and whether it is reasonable, under the circumstances, to compel the other party to go to trial on the merits. See *In re Marriage of Jackson*, 259 Ill. App. 3d 538, 542 (1994); *People ex rel. Reid v. Adkins*, 48 Ill. 2d 402, 406 (1971) (applying predecessor provision).

¶ 58    By contrast, where a litigant seeks relief from a final order or judgment more than 30 days after its entry pursuant to section 2-1401(a), the burden he or she faces is substantially greater. A party seeking to set aside a final order or judgment under section 2-1401(a) is required to show by a preponderance of the evidence not only the existence of a meritorious claim or defense in the original action, but also due diligence in pursuing the claim or defense in the circuit court as well as due diligence in presenting the petition for relief under section 2-1401(a). *People v. Vincent*, 226 Ill. 2d 1, 7 (2007); see *In re Adoption of D.*, 317 Ill. App. 3d 155, 159 (2000). The only time a meritorious claim or defense or due diligence need not be established in a proceeding under section 2-1401(a) is when the order or judgment at issue is attacked as void. *People v. Vincent*, 226 Ill. 2d at 7 n.2; *Sarkissian v.*

*Chicago Board of Education*, 201 Ill. 2d 95, 104 (2002).

¶ 59    When Ralph sought to set aside the finding of default in this case, he initially framed his request as a motion brought pursuant to section 2-1301(e) (735 ILCS 5/2-1301(e) (West 2008)). He subsequently recast the request in the form of a petition under section 2-1401(a) (735 ILCS 5/2-1401(a) (West 2008)) in response to the State's contention that Ralph's original motion was untimely and that the circuit court no longer had jurisdiction to consider. The assumption that section 2-1301(e) was no longer available and that section 2-1401(a) was the only procedural mechanism left to Ralph for challenging the entry of default against him subsequently took hold. It was accepted uncritically by both the circuit and appellate courts in this case and served as the predicate for the rulings which followed.

¶ 60    In fact, the State and the lower courts had things reversed. As a matter of law, the only statutory provision which could have been properly invoked by Ralph under the circumstances present here was the one he did invoke in his initial motion, section 2-1301(e). Relief under section 2-1401(a) was premature.

¶ 61    The reason for this is clear, though it went unrecognized in the proceedings below: the circuit court's April 14, 2009, ruling that Ralph had defaulted on the petition to terminate was not a final judgment or order. To be final, an order or judgment must terminate the litigation between the parties on the merits or dispose of the rights of the parties, either on the entire controversy or a separate part thereof. *In re Marriage of Gutman*, 232 Ill. 2d 145, 151 (2008). The April 14 order did not meet this test.

¶ 62    It is well established that once there has been a finding of neglect and a child has been adjudged a ward of the court pursuant to the Juvenile Court Act, as occurred here, the proceedings by which parental rights are terminated are governed by the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2008). See 705 ILCS 405/2-29 (West 2008); *In re Tolbert*, 62 Ill. App. 3d 927, 929 (1978)). Under the Adoption Act, orders terminating parental rights are nonfinal and interlocutory. See *In re Adoption of D.*, 317 Ill. App. 3d at 160-61; *In re Estate of Griffin*, 160 Ill. App. 3d 670, 675 (1987).

¶ 63    That this is so has been expressly recognized by the rules of this court since 1969, when subsections (a)(5) through (a)(7) were added to Rule 307. See Ill. S. Ct. R. 307, Committee Comments, ¶ (a). Subsection (a)(6) of Rule 307 (Ill. S. Ct. R. 307(a)(6) (eff. Feb. 26, 2010)), which is the predicate for Ralph's appeal in this case, specifically characterizes orders terminating parental rights as interlocutory in nature. Under the rule, such orders "may" be appealed immediately to the appellate court as a matter of right, and when a party elects to pursue such an appeal, the appeal must be perfected within 30 days from the entry of the interlocutory order. A party who wishes to challenge such an order is not, however, required to bring an immediate interlocutory appeal under Rule 307. Rather, he or she may wait until final judgment has been entered in the case and challenge the termination order at that time. See *Salsitz v. Kreiss*, 198 Ill. 2d 1, 11-12 (2001); *In re Adoption of D.*, 317 Ill. App. 3d at 161; *In re Estate of Griffin*, 160 Ill. App. 3d at 674.

¶ 64    Furthermore, the circuit court's ruling on April 14, 2009, did not even purport to rise to the level of an order actually terminating Ralph's parental rights. It merely found Ralph to be in default and set the matter for further proceedings the following month. A default order

-15-

is not the same as a default judgment. A default order precedes a default judgment, and additional steps must normally be taken before judgment is actually entered. *American Service Insurance Co. v. City of Chicago*, 404 Ill. App. 3d 769, 778-79 (2010). Not only is a mere finding of default not final, it does not even qualify as the type of interlocutory order immediately appealable as of right under Supreme Court Rule 307(a). *Burton v. Autumn Grain Transport, Inc.*, 222 Ill. App. 3d 755, 756 (1991).

¶ 65 Ralph's parental rights were not terminated until the court entered its order of December 1, 2009, more than seven months after the April 14 determination that he was in default. When the April 14 finding of default was entered, the State and the court both contemplated that a "prove up" would still be necessary. In this respect, the situation is analogous to civil cases seeking damages where a default is entered on the question of liability following a defendant's failure to answer and appear, but proof of damages has yet to be presented. Where that occurs, the entry of default is considered a nonfinal order for purposes of section 2-1301. See *Stotlar Drug Co. v. Marlow*, 239 Ill. App. 3d at 728; accord *Johnson v. Cape Industries, Ltd.*, 91 Ill. App. 3d 192, 196 (1980) (default not a final order where subsequent proceedings were contemplated for proof of damages). No principle of law supports a contrary conclusion under the circumstances present here.

¶ 66 Because the circuit court's April 14 default ruling was not a final order or judgment, the 30-day postjudgment deadline specified in section 2-1301(e) of the Code of Civil Procedure (735 ILCS 5/2-1301(e) (West 2008)) had not yet even begun to run when Ralph moved to have the default set aside. That being so, it necessarily follows that Ralph was not required to resort to relief under section 2-1401(a), which applies, by its terms, only in those instances when the 30-day postjudgment period has expired. Because a petition for relief under section 2-1401 was neither necessary nor proper (see *Bruno Benedetti & Sons, Inc. v. O'Malley*, 124 Ill. App. 3d 500, 503 (1984)), the circuit court should have considered Ralph's request to set aside the default using the standards applicable to motions under section 2-1301(e), as Ralph originally requested, rather than those relevant to petitions under section 2-1401(a), as the State insisted. Its failure to do so is reversible error. See *Jackson v. Hooker*, 397 Ill. App. 3d 614, 621 (2010).

¶ 67 It is true that in response to the State's motion to strike his original motion to vacate, Ralph's amended request for relief invoked section 2-1401 of the Code of Civil Procedure (as well as various other provisions) rather than section 2-1301(e). The substance of Ralph's request, however, remained the same. In analogous circumstances, we have emphasized that the character of the pleading should be determined from its content, not its label. Accordingly, when analyzing a party's request for relief, courts should look to what the pleading contains, not what it is called. *Sarkissian v. Chicago Board of Education*, 201 Ill. 2d 95, 102 (2002). That is particularly appropriate here, where it is apparent, as a matter of law, that a motion should have been considered under section 2-1301(e) rather than section 2-1401(a), insistence by this court on evaluating the lower court's judgments in terms of the standards governing section 2-1401(a) petitions would only "sow confusion" in an area of the law where practitioners and trial courts are already confused enough. See *Washington Mutual Bank, F.A. v. Archer Bank*, 385 Ill. App. 3d 427, 431 (2008).

¶ 68 Having concluded that Ralph's motion to vacate the default was timely and should have

been evaluated under section 2-1301(e), we must now determine how to proceed. Normally where a circuit court is found to have applied the wrong standard, we reverse and remand to give it the opportunity to apply the correct standard. As we shall explain presently, however, the undisputed facts and the governing legal principles permit only one conclusion in this case: Ralph's request to vacate the finding of default should have been granted. A remand would therefore serve no purpose. It would merely delay the ultimate resolution of these proceedings, which have already been protracted, unnecessarily, for too long. Such an outcome would be directly contrary to this court's express policy of resolving, as expeditiously as possible, appeals involving questions of child custody, adoption, termination of parental rights or other matter affecting the best interests of a child. See Ill. S. Ct. R. 311 (eff. Feb. 26, 2010).

¶ 69 Where, as here, a request to set aside a default has been made before final order or judgment has been entered in a case, section 2-1301(e) provides that the decision as to whether the default should be set aside is discretionary. 735 ILCS 5/2-1301(e) (West 2008). In exercising that discretion, courts must be mindful that entry of default is a drastic remedy that should be used only as a last resort. See *Bank & Trust Co. v. Line Pilot Bungee, Inc.*, 323 Ill. App. 3d 412, 414 (2001). The law prefers that controversies be determined according to the substantive rights of the parties. See *Lynch v. Illinois Hospital Services, Inc.*, 38 Ill. App. 2d 470, 475 (1963). The provisions of the Code of Civil Procedure governing relief from defaults are to be liberally construed toward that end. See *Bank & Trust Co.*, 323 Ill. App. 3d at 414-15. When a court is presented with a request to set aside a default under section 2-1301(e), the overriding consideration, as we have already observed, is simply whether or not substantial justice is being done between the litigants and whether it is reasonable, under the circumstances, to compel the other party to go to trial on the merits. See *In re Marriage of Jackson*, 259 Ill. App. 3d 538, 542 (1994); *People ex rel. Reid v. Adkins*, 48 Ill. 2d 402, 406 (1971) (applying predecessor provision to section 2-1301). In making this assessment, a court should consider all events leading up to the judgment. "What is just and proper must be determined by the facts of each case, not by a hard and fast rule applicable to all situations regardless of the outcome. [Citation.]" (Internal quotation marks omitted.) *Mann v. The Upjohn Co.*, 324 Ill. App. 3d 367, 377 (2001).

¶ 70 Given all of the circumstances present in this case, we believe that substantial justice requires that the default here be set aside. This is not a situation where a litigant received specific notice of impending action and simply chose to ignore it. As we have described, the record shows that the petition for termination on which Ralph was found to have defaulted was not served on Ralph or furnished to any attorney acting on his behalf. Service on Ralph was, in fact, never attempted. Ralph likewise had no notice that the petition would be called for hearing on April 14, the same day as the previously scheduled permanency hearing.

¶ 71 In an attempt to justify its failure to comply with the service provisions of Supreme Court Rule 11, the State argues on appeal that, notwithstanding the express reference to that rule in section 2-15(3) of the Juvenile Court Act (705 ILCS 405/2-15(3) (West 2008)), compliance with Rule 11 was not required. This argument is untenable for three reasons. First, it is contrary to the position taken by the State in the trial court. At no time during those proceedings did the State suggest in any way that it had no obligation to serve Ralph with the

termination petition. To the contrary, at the hearing where it moved for entry of default against Ralph, the attorney for the State represented to the trial court, incorrectly, that measures necessary to serve him had been taken.

¶ 72    Second, even if the State's reading of the statute were valid, it would not be determinative of whether the default should be set aside under section 2-1301(e). Notice is but one factor. *All* events leading up to the judgment must be assessed in considering whether substantial justice is being done.

¶ 73    Third, the State's argument is incorrect as a matter of law. The plain language of section 2-15(3) of the Juvenile Court Act (705 ILCS 405/2-15(3) (West 2008)) unambiguously requires that Supreme Court Rule 11 be followed. It is well settled that courts cannot depart from the plain language of a statute by reading into it exceptions, limitation, or conditions not expressed by the legislature. See *Krautsack v. Anderson*, 223 Ill. 2d 541, 567-68 (2006) (Karmeier, J., dissenting).

¶ 74    Mindful of this impediment to its position, the State asserts that section 2-15(3) may not be as unambiguous as it seems. The State contends that the legislature incorporated Rule 11 into the statute simply to specify how and to whom service must be carried out when service is otherwise required. In the State's view, Rule 11 does not, itself, dictate *which* papers must be served. Under the State's theory, earlier language in section 2-15(3) means that only the initial petition and summons must be served and that if the legislature had intended to mandate further notice to the litigants, it would have incorporated the service provisions of Supreme Court Rule 104(b), which provides:

>    "Pleadings subsequent to the complaint, written motions, and other papers required to be filed shall be filed with the clerk with a certificate of counsel or other proof that copies have been served on all parties who have appeared and have not theretofore been found by the court to be in default for failure to plead." Ill. S. Ct. R. 104(b) (eff. Jan. 1, 1970).

¶ 75    The State's argument is unpersuasive. If the legislature's intent was that a respondent would not be entitled to receive any further notice of proceedings beyond initial service of process, there would have been no need for it to have added the qualifying phrase, "except as required by Supreme Court Rule 11." 705 ILCS 405/2-15(3) (West 2008). The legislature included this language for a reason and we must give it effect if at all possible.[10]

¶ 76    The State argues that the Rule 11 language *is* given effect where the State voluntarily serves a respondent with notice of additional proceedings or filings. Under this view, however, whether a parent received notice of subsequent proceedings and filings, including

---

[10]The Rule 11 language was added to section 2-15(3) in 1997 by House Bill 66–a trailer bill to House Bill 165, adopted the same day, which had added the no-further-notice provision. See Pub. Act 90-27, § 30 (eff. Jan. 1, 1998); Pub. Act 90-28, § 10-20 (eff. Jan. 1, 1998). The purpose of House Bill 66 was to clean up the language in House Bill 165. See 90th Ill. Gen. Assem., Senate Proceedings, May 15, 1997, at 25-26 (statements of Senator Karpiel); 90th Ill. Gen. Assem., Senate Proceedings, May 16, 1997, at 3-4 (statements of Senator Karpiel); 90th Ill. Gen. Assem., House Proceedings, May 22, 1997, at 31-32 (statements of Representative Dart).

the filing of a petition to terminate parental rights, could be decided by the whim of the particular assistant State's Attorney handling the juvenile court matter. Some respondents could receive notice of all subsequent proceedings and filings; others might receive none; and still others might receive notice only sporadically. A court will presume, however, that the legislature did not intend to produce absurd or unjust results. *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007).

¶ 77        We note, moreover, that it is a basic tenet of statutory construction that a statute should be considered as a whole and interpreted in light of other relevant provisions. *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 184 (2007). The notice provision set forth in section 2-15(3) is not the only such provision in the Juvenile Court Act. Section 2-16(2) also contains a notice provision. 705 ILCS 405/2-16(2) (West 2008). Whereas section 2-15(3) sets forth the required notice where a parent is served with summons, section 2-16(2) sets forth the required notice where a parent cannot be served with process other than by publication. In relevant part, section 2-16(2) states that notice by publication must contain language substantially as follows:

> "*Unless you appear* [at the adjudicatory hearing] you will not be entitled to further written notices or publication notices of the proceedings in this case, including the filing of an amended petition or a motion to terminate parental rights." (Emphasis added.) 705 ILCS 405/2-16(2) (West 2008).

The clear implication of this provision is that if the respondent *does* appear at the adjudicatory hearing, *i.e.*, is not in default, he or she *will be* entitled to further notices, including the filing of a petition to terminate parental rights.

¶ 78        No reason exists to provide less notice to a respondent who was served with summons and appears at the adjudicatory hearing than a respondent who is notified by publication and appears at the adjudicatory hearing. Section 2-15(3) should therefore be read, in concert with section 2-16(2), as entitling a respondent who appears at the adjudicatory hearing and is not in default to further notice of proceedings and filings, including the filing of a petition to terminate parental rights. Correspondingly, we reject the notion that because the statute does not expressly incorporate Rule 104(b), it must have intended that service of pleadings was not required after the initial service of summons.

¶ 79        Construing section 2-15(3) as requiring notice of all subsequent proceedings and filings to parties not in default is also consistent with the appointment of counsel provisions contained in the Juvenile Court Act. See 705 ILCS 405/1-5(1), 2-15(2) (West 2008). After all, the General Assembly would not provide a respondent with appointed counsel, and then permit the State to keep counsel in the dark as to subsequent proceedings and filings. See *In re R.G.*, 165 Ill. App. 3d 112, 127 (1988) ("It would seem a useless gesture on the one hand to recognize the importance of counsel in proceedings to terminate parental rights–as evidenced by our statutory right for same–and, on the other hand, not require that counsel perform effectively."). The State's suggestion–that counsel must simply monitor the case–is unrealistic. Without notice by the State of subsequent proceedings and filings, counsel would be required to keep a continuous daily vigil over the court docket to determine if any pleadings were filed and, if so, obtain a copy. This is no small task, especially here, where

the State filed its petition to terminate parental rights almost four months after it obtained leave to do so. For all of these reasons, section 2-15(3) must be read to require the State to serve respondents who have appeared and are not in default on the adjudicatory petition with notice of subsequent proceedings and filings, in the manner set forth in Rule 11.

¶ 80 As we have pointed out several times now, Ralph received no such notice here. But this is not the only factor militating in favor of setting aside the default. In considering the other background circumstances which led to the default being entered, we further observe that this is not a situation where a litigant was remiss in following the progress of his case or dilatory in asserting his rights. Though no one had ever notified Ralph that a petition for termination was on file and would be heard on April 14, he was fully aware of the permanency hearing set for that day and intended to be there. According to the evidence on file, which the State has never contested, he failed to appear because he was responsible for four other children and had difficulty finding help to care for them on the date in question and because his automobile had a flat tire.

¶ 81 Further supporting our conclusion that the default should be set aside is that it resulted from misrepresentations and misunderstandings regarding the posture of the case. When Ralph failed to appear at the April 14 hearing and the circuit court found him in default, it did so based on the erroneous impression, supported by incorrect representations made by counsel for the State, that the State had satisfied the legally required steps for serving Ralph with the petition to terminate his parental rights and notifying of when that petition would be heard. In fact, as to Ralph, the notice and service requirements imposed by local rule, the rules of this court and the Juvenile Court Act were ignored.

¶ 82 We also find it significant that, following entry of the default, Ralph promptly secured counsel who appeared at the very next hearing, which was less than 30 days later, and advised the court of her intention to move to have the default set aside. According to an affidavit from Ralph's attorney, which the State has not challenged, she would have appeared even sooner than that but for chronic and serious medical problems which necessitated that she retain additional counsel to assist her in drafting the appropriate legal documents.

¶ 83 The circuit court granted Ralph's lawyer additional time to file her motion to set aside the default, and the lawyer had the appropriate motion on file within the time allowed by the court and permitted under the law. If anyone was dilatory with respect to the issue of whether the default should be set aside, it was the State, which did not file its motion to strike Ralph's motion to set aside the default until two weeks after the deadline set for it by the circuit court. Moreover, there is nothing in the record to suggest any delay attributable to Ralph's inability to appear at the April 14 hearing in any way compromised the State's ability to present or prosecute any of the claims it had asserted in its petition for termination of parental rights and authorization for the guardian to consent to adoption.

¶ 84 We note, in particular, that the delay did not and could not have affected Haley's ultimate placement. Even if the April 14 finding of default on the petition could somehow be construed as an actual default termination judgment, which it cannot, the State could still have taken no further action toward Haley's adoption prior to the time Ralph's lawyer appeared in court on May 12 to announce Ralph's desire to have the default set aside or even

before her filing of a formal written motion to vacate the default on June 1. That is so because, under the express provisions of Supreme Court Rule 305(e)(1) (Ill. S. Ct. R. 305(e)(1) (eff. July 1, 2004)), the termination order would have been automatically stayed for 60 days following its entry, a period which would not have expired until Monday, June 15.

¶ 85 While Ralph was not required to establish the existence of a meritorious defense in order to obtain relief from the default entered against him on the State's petition to terminate, we further note that it is clear from the record that he had such a defense. To understand why this is so, it is important to recall the basis for the State's termination petition.

¶ 86 As set forth previously in this opinion, the State alleged that Ralph's parental rights should be terminated on the grounds that he was unfit within the meaning of section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2008)) for two specific reasons: (1) because he had "failed to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent within nine (9) months after an adjudication of NEGLECTED MINOR under the Juvenile Court Act of 1987 [705 ILCS 405/2-3 (West 2008)]from 8-14-07 through 5-14-08," and (2) because he had failed "to make reasonable progress toward the return of the child to the parent within 9 months after [the child had been adjudicated a] NEGLECTED MINOR, under the Juvenile Court Act of 1987 [705 ILCS 405/2-3 (West 2008)] from 8-14-07 through 5-14-08."

¶ 87 With regard to the first of these contentions, the basis for the initial removal of Haley from Ralph related to his failure to take measures that would have prevented the child from being exposed to cocaine *in utero* through Patricia, whom he knew to suffer from a cocaine addiction. It would seem, however, that this particular problem no longer existed once Haley was born and removed from Patricia's custody and care.

¶ 88 There is a separate obstacle to the State's first contention which also dooms its second, alternative claim of unfitness. It pertains to the time frame invoked by the State. Our court has held that the nine-month period specified in section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2008)) begins on the date the minor is adjudged to be neglected, not on the date the court enters the dispositional order. *In re D.F.*, 208 Ill. 2d 223, 239-42 (2003). But the beginning date cited by the State's petition here, August 14, 2007, is the date the circuit court entered the dispositional order. It is not the date Haley was found to be neglected. The date on which Haley was adjudicated a neglected minor, and the day on which the relevant nine-month period specified in section 1(D)(m) of the Adoption Act actually commenced, was July 31, 2007, two weeks earlier. Correspondingly, the statutory nine-month period expired at the end of April 2008, not the following May. Our court has specifically held that where, as here, the State charges lack of parental fitness under section 1(D)(m), a parent's conduct must be assessed based solely on the efforts made by the parent within the nine-month period following the adjudication of neglect. Evidence of the parent's efforts outside that period may not be considered. *Id.*; see *In re D.L.*, 191 Ill. 2d 1, 10 (2000).

¶ 89 The record before us shows that Ralph's progress in meeting his goals was reviewed regularly and was not found deficient by the court until September of 2008.That was over four months *after* the relevant nine-month period had ended. Had the circuit court checked

its prior rulings in the case in light of the specific allegations made by the State, it would have discovered this discrepancy and realized that the State's petition, as drafted, was untenable as a matter of law.

¶ 90 Finally, the interests at stake in this litigation are significant. While courts must always remain mindful of the best interests of minor children in cases such as this, the focus of the Juvenile Court and Adoption Acts is not solely on the child. A parent's right to raise his or her biological child is a fundamental liberty interest (*In re E.B.*, 231 Ill. 2d 459, 463 (2008)), and Illinois law favors natural parents having custody of their children (*id.* at 473).

¶ 91 All of the foregoing considerations militate strongly in favor of granting relief to Ralph from the entry of default against him on the State's petition to terminate his parental rights. We have been unable to identify any valid countervailing considerations that would justify allowing the default to remain in effect under the circumstances present here. Setting aside the default is therefore necessary to insure that justice is done between the parties. Correspondingly, the order terminating Ralph's parental rights must be vacated and the cause remanded to the circuit court for further proceedings.

¶ 92 Because we are remanding the cause and because of the numerous errors which have plagued this proceeding to date, we think it appropriate to reiterate what we said at the outset of our analysis in *In re E.B.*, 231 Ill. 2d 459, 463-64 (2008):

> "[A] proceeding to involuntarily terminate a parent's rights is a 'drastic measure.' [Citation.] In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act. [Citation.] These acts contain strict procedural requirements that embody Illinois' policy that favors parents' superior right to the custody of their own children. [Citation.] When a court exercises its authority, it 'must proceed within the confines of that law and has no authority to act except as that law provides.' [Citation.] A court 'is not free to reject or expand its statutory authority despite the desirability or need for such action.' [Citation.] Any action the trial court takes that is outside the statute's stricture is void."

¶ 93 We are confident that, on remand, that the circuit court and counsel for the State will be mindful of these principles and that they will fully comply with all applicable statutes and rules of court should the State elect to proceed with termination of Ralph's parental rights. Given this, and in light of the basis for our holding today, we do not reach and we express no view on whether the notice previously provided to Ralph was sufficient to meet federal due process requirements.

¶ 94                                            CONCLUSION

¶ 95 For the foregoing reasons, we agree with the appellate court's conclusion that the circuit court erred when it denied Ralph's motion to set aside the default order, that the judgment terminating Ralph's parental rights based on the default order must be vacated and that the cause should be remanded to the circuit court for further proceedings. The judgment of the appellate court is therefore affirmed.

¶ 96    Affirmed.

¶ 97    JUSTICE THEIS, specially concurring:

¶ 98    The majority affirms the appellate court judgment vacating the order that terminated Ralph's parental rights (403 Ill. App. 3d 370), and remands the cause to the circuit court for further proceedings. *Supra* ¶ 95. I agree with this result. I write separately, however, because the majority blurs the line between the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2008)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2008)), creating unnecessary uncertainty in the law. To illustrate:

¶ 99    The majority states, in the background section of the opinion, that the trial judge failed to heed the affidavit requirements set forth in Eighteenth Judicial Circuit Local Rule 21.09(a), which the majority indicates are applicable where counsel seeks a default order terminating a person's parental rights. *Supra* ¶ 31. Later, in the analysis section, the majority again states that the notice and service requirements imposed by local rule were ignored. *Supra* ¶ 81. Rule 21.09(a), however, is one rule in a series of local rules governing "Adoptions." See 18th Judicial Cir. Ct. Rs. Art. 21, Adoptions (July 16, 2008). Although a petition to terminate parental rights filed in an abused, neglected or dependent minor proceeding under the Juvenile Court Act looks to the Adoption Act for the grounds of parental unfitness (705 ILCS 405/2-29 (West 2008)), this interplay between the two statutes does not transform an abuse, neglect and dependency proceeding into an adoption proceeding. Indeed, Eighteenth Judicial Circuit Local Rule 21.10(a) recognizes as much when it makes provision for "adoption cases where the parental rights of a biological or legal parent have been terminated *in a Juvenile Court proceeding*." (Emphasis added.) 18th Judicial Cir. Ct. R. 21.10(a) (July 16, 2008). In such cases, a judgment of adoption will not be entered "until the appeal rights of each such parent have been exhausted." *Id.* See also Ill. S. Ct. Rs. 305(e)(1), (e)(3) (eff. July 1, 2004) (reflecting different treatment of termination orders in Juvenile Court Act proceedings and Adoption Act proceedings).

¶ 100   The present case proceeded under the Juvenile Court Act, not the Adoption Act. Thus, the requirements for service and notice set forth in the Juvenile Court Act govern (705 ILCS 405/2-16 (West 2008)). The majority's recourse to a local rule applicable to adoption proceedings is unnecessary and ill-advised.

¶ 101   I am also troubled by the majority's discussion of whether the April 14, 2009, default order was a final order. The majority's analysis proceeds along the following lines: Once there has been a finding of neglect and the child is made a ward of the court, the proceedings by which parental rights are terminated are governed by the Adoption Act; under the Adoption Act, orders terminating parental rights are nonfinal and interlocutory; thus all orders terminating parental rights are nonfinal and interlocutory. *Supra* ¶ 62.

¶ 102   Preliminarily, I note that the opinion makes plain that the April 14, 2009, default order did not purport to terminate Ralph's parental rights. *Supra* ¶ 64. Thus, the entire discussion of the supposed interlocutory nature of termination orders is not necessary to the opinion.

¶ 103   Moreover, the discussion adds uncertainty to an already complex area of law by confusing orders terminating parental rights entered in proceedings under the Juvenile Court

-23-

Act with orders terminating parental rights entered in proceedings under the Adoption Act. As explained in *In re Adoption of D.*, 317 Ill. App. 3d 155 (2000), and *In re Estate of Griffin*, 160 Ill. App. 3d 670 (1987), which the majority cites (*supra* ¶ 63), an order terminating parental rights entered in an adoption proceeding is interlocutory and does not become final until the judgment of adoption is entered. Thus, dismissal of the adoption has the effect of setting aside the interlocutory termination order. *Adoption of D.*, 317 Ill. App. 3d at 160-61; *Estate of Griffin*, 160 Ill. App. 3d at 675-76. The same cannot be said of an order terminating parental rights pursuant to a proceeding under the Juvenile Court Act; its finality does not depend upon whether the child is adopted. As this court has explained:

> "An order terminating parental rights and appointing a guardian to consent to adoption is a final order because the specific permanency goal is achieved and there is no need for the issue of termination to be reevaluated under the [Juvenile Court] Act. Indeed, under the Act, '[a]n order so empowering the guardian to consent to adoption deprives the parents of the minor of all legal rights as respects the minor and relieves them of all parental responsibility for him or her, and frees the minor from all obligations of maintenance and obedience to his or her natural parents.' 705 ILCS 405/2-29(2) (West 2002). It therefore sets the rights of the parents, who may then appeal." *In re A.H.*, 207 Ill. 2d 590, 595 (2003).

Contrary to the majority opinion, orders terminating parental rights in Juvenile Court proceedings are typically final orders.

¶ 104    The majority also relies on this court's own rules, stating that Rule 307 expressly recognizes that orders terminating parental rights are nonfinal and interlocutory. *Supra* ¶ 63. This is simply not true. Rule 307 provides that an appeal may be taken to the appellate court from certain interlocutory orders, including an interlocutory order terminating parental rights. Ill. S. Ct. R. 307 (eff. Feb. 26, 2010). Rule 307 does not make an order interlocutory; it merely provides for appeal where the order is, as a matter of law, interlocutory in nature.

¶ 105    To add to the confusion, the majority states that the December 1, 2009, default judgment which terminated Ralph's parental rights was a nonfinal order, not because it was entered in a termination proceeding subject to the Adoption Act or because it is a nonfinal order under Rule 307–as the majority's analysis would seem to indicate–but because it did not enter all of the relief requested by the State in its petition, namely, appointment of a guardian with the power to consent to adoption. See *supra* ¶ 47 n.9. Though I agree that the December 1, 2009, default judgment was a nonfinal order because it left open the State's request for the appointment of a guardian, the majority's explanation in the background section as to why the default judgment is interlocutory does not mesh with its later discussion in the analysis section. Thus, the majority opinion is internally inconsistent.

¶ 106    Because the majority opinion creates uncertainty in this area of the law by unnecessarily blurring the line between proceedings under the Juvenile Court Act and the Adoption Act, I cannot join in the foregoing portions of the majority's background discussion and analysis.

¶ 107    JUSTICE GARMAN joins in this special concurrence.