2022 IL App (2d) 220203-U
No. 2-22-0203
Order filed September 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| *In re* L.H., a Minor, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| | ) | |
| | ) | No. 20-JA-140 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Karlon H., | ) | Kathryn D. Karayannis, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice Brennan and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: We grant appellate counsel's motion to withdraw and affirm the trial court's judgment terminating respondent's parental rights, concluding there exist no issues of arguable merit to be raised on appeal.

¶ 2    Respondent, Karlon H., appeals from the trial court's order finding him unfit to parent his daughter, L.H., and terminating his parental rights. His appellate counsel has moved to withdraw under *Anders v. California*, 386 U.S. 738 (1967), stating he has read the record and concluded there exist no issues of arguable merit to be raised on appeal. See *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000) (*Anders* applies to termination cases). Counsel has supported his motion with a memorandum of law providing a statement of facts, potential issues, and argument as to why those

issues lack arguable merit. Counsel served respondent with a copy of the motion and memorandum. We advised respondent that he had 30 days to respond to counsel's motion and explain why (1) counsel's motion should not be granted and (2) this court should not affirm the trial court's judgment. That time has passed, and respondent has not responded. For the reasons set forth in counsel's memorandum, we agree this appeal lacks arguable merit. Therefore, we grant counsel's motion and affirm the trial court's judgment.

¶ 3     L.H.'s brother, A.K., was born on August 28, 2015. In October 2017, the Department of Children and Family Services (DCFS) opened an investigation based on concerns that A.K.'s mother, Patsy K.[1], was using heroin. Patsy was offered but refused intact family services and indicated she would seek substance-abuse treatment on her own.

¶ 4     On August 29, 2020, Patsy gave birth to L.H. Immediately after her birth, L.H.'s urine tested positive for opiates and cocaine, and Patsy admitted to using cocaine and heroin three hours before she arrived at the hospital to deliver L.H. Thus, the same day, DCFS took protective custody of L.H. On September 1, 2020, the State filed a neglect petition under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.*) (West 2020)). The State alleged L.H. was neglected by reason of her having been born with cocaine and/or opiates in her urine, blood, and/or meconium (705 ILCS 405/2-3(1)(c) (West 2020)). The State also alleged L.H.'s environment was injurious to her welfare, thereby creating a risk of harm, based on Patsy's drug use and the presence

---

[1]Patsy later consented to the termination of her parental rights and is not a party to this appeal.

of opiates and cocaine metabolites in L.H.'s urine, and that respondent failed to protect L.H. (705 ILCS 405/2-3(1)(b) (West 2020)).[2]

¶ 5    On December 1, 2020, after a stipulated hearing, the trial court entered an adjudicatory order, finding L.H. had been neglected as alleged in the State's petition. On January 5, 2021, the court entered a dispositional order, finding respondent unable, for reasons other than financial circumstances alone, to care for, protect, train, educate, supervise, or discipline L.H. and granting DCFS custody, guardianship, and the right to place L.H. The order required respondent to engage in all services required by DCFS, which included a substance-abuse evaluation and treatment, a mental-health assessment and recommendations, parenting classes and coaching, and to maintain stable employment, cooperate with the agency, and consistently participate in visits with L.H.

¶ 6    The initial permanency goal was return home within 12 months. Before a May 4, 2021, status hearing, the trial court received reports from Kayla Milakis, a Youth Service Bureau (agency) caseworker, and Maddie B., a court appointed special advocate (CASA). Relative to respondent, the reports noted that the family service plan required respondent to participate in medication monitoring for health purposes, participate in both mental-health and substance-abuse assessments and follow through with any recommendations, participate in a parenting education program, and engage in visitation with A.K. and L.H. The reports indicated respondent had consistently attended his biweekly visitation with the children since January 2021, during which he engaged with the children and met their needs. However, the reports also indicated the agency

_____

[2]The State filed a neglect petition concerning A.K. the same day, and the case was docketed as 20-JA-139. The cases proceeded simultaneously. Respondent's parental rights as to A.K. were ultimately terminated, and that judgment is the subject of appeal No. 2-22-0202.

provided respondent with two referrals for each service recommended in the service plan, but respondent had not scheduled any assessments or completed any services. Nor had respondent signed consents for the agency to obtain confirmation of any services that had been completed. Additionally, respondent failed to appear for a random drug test on March 17, 2021, tested positive for heroin on March 19, 2021, and failed to appear for a drug test on April 16, 2021.

¶ 7   Thus, on May 4, 2021, the trial court warned respondent in open court that he was required to cooperate with the agency, engage in the recommended services, and that missed drug tests were considered positive drug tests, noting that the matter was set for a permanency review on August 31, 2021.

¶ 8   On June 30, 2021, respondent was charged by complaint with three counts of possession of a controlled substance (one count for each of cocaine, heroin, and "opiates") (720 ILCS 570/402(c) (West 2020)) and one count of drug paraphernalia (720 ILCS 600/3.5(a) (West 2020)) in Kane County case No. 21-CF-1181. On August 17, 2021, he was charged by complaint with one count of possession of a controlled substance (cocaine) and one count of possession of drug paraphernalia in Kane County case No. 21-CF-1475.

¶ 9   Before the August 31, 2021, permanency review, the trial court again received reports from CASA and the agency. Those reports indicated respondent had consistently visited with both minors, had provided the agency with a list of his medications, had engaged in family therapy, was scheduled for a substance-abuse assessment on August 26, 2021, and was on a waiting list for a parenting education program. The reports also indicated that respondent had a negative drug test on April 23, 2021, failed to appear for a drug test on May 14, 2021, tested positive for opiates on June 23, 2021, failed to appear for a drug test on July 23, 2021, and tested positive for cocaine and opiates on August 13, 2021. In all, respondent had seven positive drug-test results since the

dispositional order (because missed tests counted as positives). At the hearing, the caseworker told the court that respondent had missed the most recent month of individual therapy and had previously scheduled substance-abuse assessments but failed to appear four times. The agency recommended that the trial court find respondent had made efforts and progress to correct the conditions of case involvement and that the permanency goal remain unchanged. The trial court, however, found respondent made neither reasonable efforts nor substantial progress, noting he had engaged in individual therapy but had missed the most recent month of it, had not engaged in substance-abuse treatment, and continued to miss drug tests or test positive. Accordingly, the court changed the goal to return home pending a status hearing to again review respondent's progress (705 ILCS 405/2-28(2)(B-1) (West 2020)).

¶ 10    On September 9, 2021, respondent was charged by complaint with burglary (720 ILCS 5/19-1(a) (West 2020)) in Kane County case No. 21-CF-1635 for conduct that occurred on July 28, 2021. While his criminal cases were pending, in early October 2021[3], respondent began inpatient substance-abuse treatment at Gateway in Chicago.

¶ 11    On November 30, 2021, the trial court changed the permanency goal to substitute care pending termination of parental rights. The court found respondent had made neither reasonable efforts nor reasonable and substantial progress toward the return of L.H. The court noted that, while respondent had completed inpatient substance-abuse treatment and was engaged in intensive outpatient treatment, he did not commence treatment until "relatively recently." Moreover, the court noted, respondent had not shown consistent sobriety (he tested positive for opiates and

---

[3]Gateway contacted respondent on Friday, October 1, 2021, to inform him that it had a bed available to him, and respondent began treatment over the weekend.

cocaine again in September 2021, just before he entered inpatient treatment); did not participate in individual therapy while in inpatient treatment, though it was available; inconsistently participated in individual therapy before he went into inpatient treatment; and had not participated in parenting classes.

¶ 12　On December 14, 2021, respondent pleaded guilty to burglary in case No. 21-CF-1635 and to one count of possession of a controlled substance in case Nos. 21-CF-1181 and 21-CF-1475. He was sentenced to probation and placed in the Kane County Drug Rehabilitation Court (drug court) program. See 730 ILCS 166/1 *et seq.* (West 2020).

¶ 13　On March 8, 2022, the State petitioned to terminate respondent's parental rights. In its petition, as amended on March 31, 2022, the State alleged, under the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2020)), respondent was unfit based on his (1) failure to make reasonable efforts to correct the conditions which were the basis for the child's removal or make reasonable progress toward the return of L.H. during a nine-month period following the adjudication of neglect, specifically, from December 2, 2020, through September 2, 2021 (*id.* § 1(D)(m)(ii)) (count I); (2) failure to protect L.H. from conditions within L.H.'s environment that were injurious to her welfare (*id.* § 1(D)(g)) (count II); (3) failure to maintain a reasonable degree of interest, concern, or responsibility as to L.H.'s welfare (*id.* § 1(D)(b)) (count III); and (4) abandonment of L.H. (*id.* § 1(D)(a)) (count IV).

¶ 14　On May 4, 2022, after a hearing, the trial court found respondent was unfit, determining the State proved counts I, II, and III of its amended petition. (During closing summation, the State conceded it had not proved count IV (abandonment) but never formally withdrew the allegation.) Preliminarily, the court expressed its support for respondent's involvement in drug court and its hope that he would be successful in that program. Nevertheless, as to count I, the court found

respondent made neither reasonable efforts nor reasonable progress during the nine-month period identified in the State's petition (December 2, 2020, through September 2, 2021). The court noted that, other than consistently engaging with visits and inconsistently engaging in individual therapy, respondent had not completed or made progress in any services in the initial nine-month period. It also noted respondent tested positive for drugs on several occasions, did not sit for a substance-abuse assessment until August 2021, and did not complete individual therapy or engage in parenting classes. As to count II, the court found respondent failed to protect L.H. from an injurious environment, based on the fact that L.H. was born drug exposed. As to count III, the court noted that respondent had more recently begun to address his substance-abuse issues and had consistently engaged in visitation. However, over the entire period L.H. was in care, respondent had not maintained a reasonable degree of interest, concern, or responsibility, given the evidence that he failed to start or engage in services and maintain sobriety over many months and was convicted of felony offenses while the case was pending.

¶ 15    That same day, after a separate best-interests hearing, the court found it was in L.H.'s best interests to terminate respondent's parental rights. Respondent appealed, and counsel was appointed to represent him.

¶ 16    As noted, counsel has moved to withdraw under *Anders*. In his supporting memorandum, counsel identified two potential issues for review: (1) whether respondent was afforded adequate time to complete the services required of him, before his rights were terminated, and, relatedly, whether the trial court's fitness findings were against the manifest weight of the evidence; and (2) whether the trial court's best-interests finding was against the manifest weight of the evidence, where L.H. had been placed in a nonrelative foster home, and not with her brother, A.K., who was

likely to be adopted by respondent's sister, Lanique, contrary to respondent's and his family's desire that the children be placed together.

¶ 17    The record shows that, at the time of trial, respondent had completed inpatient substance-abuse treatment, had engaged in intensive outpatient treatment while living at a halfway house and was actively engaged with his treatment, was in compliance with all terms of his drug-court sentence, was maintaining sobriety, had obtained employment, had reengaged in individual therapy, and was on a waiting list for parenting classes. Additionally, the record shows respondent, other than the time that he was in inpatient treatment, had consistently visited with L.H. since L.H. was taken into protective custody.

¶ 18    Preliminarily, we emphasize that respondent's engagement with substance-abuse treatment, his continued sobriety, and his more recent efforts to comply with the service plan is laudable. And we, like the trial court, support respondent's placement in drug court and hope that he will continue to be successful in that program.

¶ 19    Nevertheless, we agree with counsel that an argument that respondent was not afforded adequate time to complete his services lacks arguable merit. The trial court entered the adjudicatory order on December 1, 2020, and the State filed its termination petition on March 8, 2022, more than 14 months later. And during some of that time, respondent was either incarcerated or was in an inpatient substance-abuse facility. However, it is well-settled that the time a parent is incarcerated may be properly considered in determining whether the parent has made reasonable efforts or progress in a given nine-month period under section 1(D)(m) of the Adoption Act, and we see no reason why that logic would not extend to the time in which a parent is engaged in inpatient substance-abuse treatment when, as here, other required services (individual therapy) was available to, but refused by, respondent while he was in the inpatient facility. See *In re J.L.*, 236

Ill. 2d 329, 338-43 (2010) (rejecting the mother's argument that her incarceration should toll the nine-month period where her incarceration resulted in her having only three months to demonstrate reasonable progress). Indeed, there is no exception contained in section 1(D)(m) of the Adoption Act for a parents' time spent in an inpatient substance-abuse facility. 750 ILCS 50/1(D)(m) (West 2020); *J.L.*, 236 Ill. 2d at 340. We emphasize that respondent's effort to engage in inpatient substance-abuse treatment is not what weighed against him; rather, what weighed against him was his refusal to engage in other, available treatment, *i.e.*, individual therapy, while in substance-abuse treatment.

¶ 20　Moreover, respondent did not begin to meaningfully address his substance-abuse issues until October 2021, *after* the nine-month period at issue. And though he previously engaged with individual therapy, he did not attend that therapy in the month preceding the first permanency goal change, which was entered on August 31, 2021, just before the expiration of the nine-month period at issue. Simply put, respondent's efforts after the nine-month period at issue were not relevant to the trial court's determination that respondent was unfit on count I. See *In re D.L.*, 191 Ill. 2d 1, 10-11 (2000) (analyzing a prior version of section 1(D)(m) of the Adoption Act); accord *In re Haley D.*, 2011 IL 110886, ¶ 88.

¶ 21　As counsel points out, respondent's efforts after the expiration of the nine-month period could be considered as they relate to count III, which alleged respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to L.H. *In re Alexander R.*, 377 Ill. App. 3d 553, 556 (2007). Thus, counsel asserts, he could (but it would be frivolous to) argue that the trial court's finding on count III was against the manifest weight of the evidence, given the evidence showing he had completed inpatient substance-abuse treatment, was engaged in intensive

outpatient treatment, had reengaged in individual therapy, and had maintained sobriety and obtained employment while living at a halfway house.

¶ 22    We agree with counsel's conclusion that it would be frivolous to argue the trial court's fitness determination was against the manifest weight of the evidence. Proceedings to terminate parental rights are principally governed by the Juvenile Court Act and the Adoption Act. The Juvenile Court Act sets forth a two-step process for involuntarily terminating parental rights. *In re Deandre D.*, 405 Ill. App. 3d 945, 952 (2010). First, the State must prove by clear and convincing evidence that the parent is unfit on one of the grounds listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *Deandre D.*, 405 Ill. App. 3d at 952. Second, if the court finds the parent is unfit, the State must prove by a preponderance of the evidence that termination of the parent's rights is in the minor's best interests. *Id.* at 953.

¶ 23    We will not disturb the trial court's fitness finding unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A finding of fitness is against the manifest weight of the evidence when the finding is unreasonable. *In re D.W.*, 386 Ill. App. 3d 124, 139 (2008). The grounds for finding unfitness under the Adoption Act are independent. See 750 ILCS 50/1(D)(m) (West 2020); see also *In re B'Yata I.*, 2014 IL App (2d) 130558-B, ¶ 30. Thus, we may affirm the trial court's judgment if the evidence supports any one of the grounds alleged. *Id.*

¶ 24    Because we may affirm if *any* one ground is supported, counsel concludes it would be frivolous to assert the fitness finding on count III should be reversed, because the evidence overwhelmingly established respondent did not make reasonable efforts or progress in the nine-month period from December 2, 2020, to September 2, 2021. We agree. At a minimum, the court's finding that respondent failed to make reasonable efforts or progress toward the return of L.H.

during a nine-month period following the adjudication of neglect was not against the manifest weight of the evidence.

¶ 25    Reasonable efforts and reasonable progress are separate grounds on which the trial court may determine a parent is unfit under section 1(D)(m) of the Adoption Act. *In re Daphnie E.*, 368 Ill. App. 3d 1053, 1066 (2006). "Reasonable efforts relate to the goal of correcting the conditions that caused the removal of the child from the parent [citation], and are judged by a subjective standard based upon the amount of effort that is reasonable for a particular person." *Id.* at 1066-67. Reasonable progress is an objective standard that requires, at a minimum, "measurable or demonstrable movement" toward reunification. *Id.* at 1067. "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id.*

¶ 26    The State alleged respondent failed to make reasonable efforts or progress during the nine-month period from December 2, 2020, to September 2, 2021. Here, at a minimum, the record amply supports the trial court's determination that respondent failed to make reasonable efforts during this time period. To be sure, the record shows respondent made some efforts to comply with the initial service plan. He consistently visited with L.H. throughout the proceedings and, before the August 31, 2021, goal change, engaged in individual therapy and sat for a substance-abuse assessment on August 26, 2021. He also maintained "very good" communication with the agency caseworker throughout the case, keeping her updated "about any of the services he was going into and[,] while he was in treatment[,] he also made sure [the caseworker] had his information."

¶ 27    However, the record also shows that, during the first five months of the nine-month period, *i.e.*, from December 2, 2020, to May 4, 2021, respondent made no efforts (other than consistent

visitation) to comply with the service plan and correct the conditions that brought L.H. into custody. The agency and CASA reports encompassing that period indicated the agency provided respondent with two referrals for each service recommended in the service plan, but respondent had not scheduled any assessments or completed any services. Nor had respondent signed consents for the agency to obtain confirmation of any services that had been completed. Additionally, respondent failed to appear for a random drug test on March 17, 2021, tested positive for heroin on March 19, 2021, and failed to appear for a drug test on April 16, 2021. Thus, on May 4, 2021, the trial court warned respondent in open court that he was required to cooperate with the agency, engage in the recommended services, and that missed drug tests were considered positive drug tests. The court also warned respondent that he should promptly begin to make efforts to comply with the service plan.

¶ 28    Despite the court's warning, over the four months, respondent continued to use drugs, engaged in criminal behavior, and did not make any efforts (other than inconsistently attending individual therapy) to correct the condition that brought L.H. into care. Respondent tested positive or failed to appear for drug tests on May 14 (failed to appear), June 23 (positive for opiates), July 23 (failed to appear), and August 13, 2021 (positive for cocaine and opiates). On June 30, 2021, he was charged with possessing cocaine, heroin, opiates, and drug paraphernalia, and, on August 17, 2021, he was charged with possessing cocaine and drug paraphernalia. It was not until August 26, 2021, *i.e.*, one week short of the initial nine-month period following adjudication, that respondent sat for a substance-abuse assessment, which was geared to address the primary basis for L.H.'s wardship, *i.e.*, the parents' drug use.

¶ 29    Moreover, the record shows respondent was inconsistent with his individual therapy during the nine-month period and altogether stopped attending in August 2021, immediately before the

end of the nine-month period at issue. And by that time, respondent had only been placed on a waiting list for parenting classes.

¶ 30    Based on the foregoing, we cannot conclude the trial court's fitness finding was against the manifest weight of the evidence. In short, respondent's minimal efforts, in the nine-month period at issue, to correct the conditions which brought L.H. into care were not reasonable under the circumstances. Despite being unemployed and, therefore, having plenty of time to engage and make progress in the required services, respondent perpetuated the conditions that brought L.H. into care by continuing his drug use and did not make any effort to address that condition until the end of the nine-month period. Thus, we agree with counsel that no viable argument challenging the court's fitness finding could be raised.

¶ 31    We likewise agree with counsel's conclusion that any challenge to the court's best-interests finding would lack arguable merit. Counsel notes that respondent desired that L.H. and A.K. be placed together in his sister, Lanique W.'s. home, a desire shared by Lanique. But counsel concludes that respondent and Lanique's desire is not enough to disturb the trial court's best-interests finding, which was amply supported by the evidence.

¶ 32    The trial court's focus at the best-interests stage is the child's welfare and whether termination would improve the children's future financial, social, and emotional atmosphere. *In re D.M.*, 336 Ill. App. 3d 766, 772 (2002). "[A]t a best[-]interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364 (2004). When making a best-interests determination, the court must consider the following factors: (1) the physical safety and welfare of the child; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachment, including where the child feels love, attachment, and security; (5) the child's wishes

and long-term goals; (6) the child's community ties; (7) the child's needs for permanence, including the need for stability and continuity of relationships with parent figures, siblings, and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020). We will reverse a best-interests finding only when it is against the manifest weight of the evidence. *In re N.B.*, 2019 IL App (2d) 180797, ¶ 43.

¶ 33    At the best-interests hearing, the evidence showed that L.H., who was now approximately 20 months old, was in the hospital for 10 days after her birth due to Patsy's drug use. After L.H. was released, she was initially placed with Lanique who had already taken custody of A.K. At the time, Lanique had sciatica, making it very difficult for her to care for the children. Thus, on September 28, 2020, L.H. was placed in a traditional foster home in Plainfield, where she remained at the time of the hearing, and A.K. was placed with respondent's mother, Deborah H., where he remained at the time of the hearing.

¶ 34    According to the CASA's report and the caseworker's testimony, L.H. was doing "phenomenal[ly]" in her current placement and her foster parents were committed to providing permanency to her through adoption. Her foster parents, whom L.H. called "mama" and "dada," had three biological children, whose ages ranged from 13 to 18 years, who also lived in the home. L.H. was strongly attached to her foster family, who was the only family she had ever known. She readily responded to her foster siblings, who enjoyed cuddling, dancing, and playing with her. The family included L.H. in their activities and extended-family gatherings. L.H. had a special bedtime routine with her foster father, and she appeared to feel safe and nurtured in the home.

¶ 35    L.H. and her foster siblings are biracial, and the foster family was fostering her cultural background through books, dolls, movies, other family members, and friends. In addition, she regularly visited with A.K. and appeared to get along well with him.

¶ 36    L.H.'s foster parents were meeting all of her needs. She was always appropriately dressed, well fed, up-to-date with her medical needs, and was meeting age-appropriate milestones. The foster parents' home was clean, well-maintained, and had no apparent safety issues.

¶ 37    CASA's report indicated that the foster family had expressed a willingness to maintain contact between L.H. and her biological family, so long as the contact was beneficial and appropriate, and that the foster mother had requested visits with A.K. However, because Deborah wanted L.H. to also be placed with family, sibling visitation (other than that required by the agency) had proved difficult. At the hearing, the caseworker testified she was not sure whether the foster parents would be willing to facilitate a relationship between respondent and L.H. The caseworker also testified that A.K. was likely to be adopted by Lanique, who had expressed her willingness to provide A.K. with permanency and who was in the process of becoming licensed by DCFS.

¶ 38    Respondent testified that he planned to live with Deborah in Chicago after he was discharged from the halfway house, though that was not his long term plan. He told the court he was "working on everything [he] ha[d] to do *** in order to put [him]self in a better position," that he loved both children, and wanted to be with them. He acknowledged his past substance misuse, that he had done "some things that shouldn't have been done," and that he was wrong for neglecting his children. Respondent also testified he "was under the impression the courts would prefer to have [L.H. and A.K.] stay together." Lanique told respondent that she "would love to have a chance to have both *** children" and that her back issues would no longer be a problem.

¶ 39    To be sure, the preferences of the persons available to care for the child are a relevant consideration at the best-interests stage. 705 ILCS 405/1-3(4.05)(j) (West 2020). Nevertheless, the trial court's focus is the child's welfare and need for permanency. See *D.M.*, 336 Ill. App. 3d at 772. Here, the record shows that L.H. had been in substitute care her entire life and had lived with her current foster family since she was one month old. Now 20 months old, L.H. was in need of permanency, and the foster parents were willing to immediately provide that to her. Moreover, L.H. was strongly attached to her foster family, who was the only family she had ever known, and the family shared that same strong attachment to her. Further, the foster family provided for and met all of L.H.'s needs, fostered her cultural background, and was willing to facilitate family ties.

¶ 40    Based on the foregoing, we agree with counsel that any argument that the trial court's best-interests finding was against the manifest weight of the evidence lacks arguable merit. Here, the court considered the relevant statutory best-interests factors, and the record supports its finding that termination was in L.H.'s best interests.

¶ 41    Accordingly, after examining the record, the motion to withdraw, and the memorandum of law in support thereof, we agree with counsel that the appeal presents no issues of arguable merit. We therefore grant counsel's motion to withdraw and affirm the judgment of the circuit court of Kane County.

¶ 42    Motion granted; affirmed.