2026 IL App (4th) 250856

NO. 4-25-0856

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 12, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.T.P., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macoupin County |
|    Petitioner-Appellee, | ) | No. 22JA26 |
|    v. | ) | |
| Shane P., | ) | Honorable |
|    Respondent-Appellant). | ) | Joshua Aaron Meyer, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Zenoff and Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1   Respondent, Shane P., appeals the trial court's order terminating his parental rights as to his son, L.T.P. (born in October 2019). Respondent argues that the court's determinations that he was unfit and that termination of his parental rights was in L.T.P.'s best interest were against the manifest weight of the evidence. The State contends, as a threshold matter, that we lack jurisdiction over the appeal because respondent cited the wrong supreme court rule in his notice of appeal. We affirm.

¶ 2           I. BACKGROUND

¶ 3   On July 26, 2022, the State filed a petition for adjudication of wardship concerning L.T.P. The petition alleged that L.T.P. was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2022)) in that he was in an environment injurious to his welfare because (1) respondent's habitual drug use

rendered the home an unsafe environment and (2) "the unsanitary, below-minimum standards condition of the home" rendered it an unsafe environment.

¶ 4    On July 27, 2022, the trial court entered an order granting temporary custody of L.T.P. to the Illinois Department of Children and Family Services (DCFS).

¶ 5    On October 20, 2022, the trial court entered an adjudicatory order, finding L.T.P. was neglected in that he was in an environment that was injurious to his welfare.

¶ 6    On November 21, 2022, the trial court entered a dispositional order, finding it was not consistent with the health, safety, welfare, or best interest of L.T.P. that he be made a ward of the court. The dispositional order found respondent was fit, able, and willing to care for, protect, train, educate, supervise, or discipline the minor, and respondent would not endanger the health, safety, or well-being of the minor. The court ordered that custody of L.T.P. be granted to respondent but guardianship be granted to DCFS. The dispositional order stated that the case was "in aftercare."

¶ 7    On June 13, 2023, the trial court entered an agreed permanency order, stating it had been informed that L.T.P. was taken back into DCFS custody. The court found there was probable cause and immediate and urgent necessity for DCFS to take custody of the minor, and reasonable efforts had been made by DCFS, but they did not prevent the need for removal. The court ordered that the permanency goal be changed to return home within 12 months.

¶ 8    On December 13, 2024, the trial court entered a permanency order, changing the permanency goal to substitute care pending determination on termination of parental rights.

¶ 9    On December 30, 2024, the State filed a motion for termination of parental rights and appointment of a guardian with the power to consent to adoption. The petition alleged that respondent was unfit under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(i)

(West 2024)) because he failed to make reasonable progress toward the minor's return during the nine-month period from July 6, 2023, to April 6, 2024. The motion alleged it was in the minor's best interest that respondent's parental rights be terminated.

¶ 10    On May 22, 2025, a hearing was held on the issue of unfitness. Respondent testified that L.T.P. was originally brought into care due to concerns about respondent's drug use and home environment. Respondent stated he was given a service plan, he "worked through" the plan, and L.T.P. was returned to his care. He subsequently relapsed into methamphetamine use, and L.T.P. was returned to DCFS custody. Respondent stated he only used methamphetamine one time when L.T.P. was in his care.

¶ 11    Respondent testified that he had been cooperative with DCFS. He stated that between July 6, 2023, and April 6, 2024, he had been self-employed and was also employed by another individual. He stated he had been "let go" from several jobs because he could not work 40 hours a week due to all the services DCFS required him to complete. In addition to his employment, he received money from leasing land and disability benefits.

¶ 12    Respondent testified that, during the time period in question, his caseworker and parenting services workers advised him each week of things around his home that they wanted him to clean up, and he did so. His parenting services were still ongoing in April 2024.

¶ 13    Respondent acknowledged that he tested positive for methamphetamine in January and March 2024, but he disagreed with the test results. He stated he had not used methamphetamine since June 2023. He indicated that the caseworker accused him of interfering with some of his drug tests by using someone else's urine, and he told her he had not done so.

¶ 14    Respondent testified that he relapsed in June 2023 because he had stopped taking Adderall. In early February 2024, he began seeing a new psychiatrist and started taking Adderall

again. Respondent testified that, based on his "Google research," he believed that Adderall could "come back as a methamphetamine" on a drug test. He stated that his hair follicle drug tests would have to be "cross examine[d]" with his Adderall prescription in order to be accurate.

¶ 15      Respondent testified that he paid for independent drug testing at Quest Diagnostics when he had positive drug tests through DCFS because he believed the tests were false positives. The trial court admitted into evidence records from Quest Diagnostics showing that respondent tested negative for methamphetamine and amphetamines on February 1, 2024, and February 15, 2024. A Quest Diagnostics report from April 4, 2024, showed that respondent tested positive for methamphetamine, but it did not show a result for any other substance. The April 4 report stated in the "Comments" section: "REJECTED FOR TESTING: FATAL FLAW, INSUFFICIENT SPECIMEN QUANTITY." Respondent stated this meant there was not enough hair after they tested for methamphetamine to retest the sample for his medication.

¶ 16      Respondent testified that, between July 6, 2023, and April 6, 2024, he had visits with L.T.P. twice per week, and the visits went well.

¶ 17      Alyssa Williams testified that she worked for DCFS and had been L.T.P.'s caseworker since October 2022. L.T.P. was initially brought into care due to parental drug use and the unsanitary conditions of the home. L.T.P. was returned to respondent's care for a period of time in late 2022 or early 2023. L.T.P. was again removed from the home due to respondent's drug use. Respondent admitted to Williams that he had used methamphetamine a few times when L.T.P. was present in his home. He also admitted to using other people's urine to produce negative test results.

¶ 18      Williams testified that between January 2023 and April 2024, the issues with respondent's home had not been corrected. At one point, the only running water in the house was

in the shower. There was a lot of clutter in the home, and the ceiling was collapsing in the living room. Outdoors, there was "junk everywhere," including "huge piles" of scrap wire and metal, cars, mowers, and tractors. Williams stated that L.T.P. could get hurt on these things if not properly supervised. Williams stated that these issues had not been corrected in April 2024.

¶ 19 Williams stated that between January 2023 and April 2024, respondent tested positive for tetrahydrocannabinol (THC) and methamphetamine on drug tests she ordered. She acknowledged that some of his tests between September 2023 and April 2024 were negative. Respondent claimed he was not using drugs during that time and gave excuses as to why the test results might have been positive, including being near someone who was using drugs, bodily fluids from a sexual partner, and a new medication he was taking.

¶ 20 Williams testified that the test results she received showed the levels of substances in respondent's system so that she could monitor whether they were falling or rising. Williams acknowledged submitting a permanency hearing report in August 2023 stating that respondent's levels dropped from 2,000 picograms of methamphetamine to approximately 1,224 picograms. However, she testified that in March 2024, which was the last time respondent was tested during the relevant time period, the levels were rising.

¶ 21 Williams testified that she had been trained on how to do oral swabs but had not otherwise received any training on drug testing. Respondent's counsel asked her what training she had on interpreting urinalysis results. She replied: "The results get sent to me showing if they're positive or negative. I don't interpret anything." Defense counsel asked Williams if she knew what the "cut offs" were for a urinalysis when someone is prescribed Adderall, and she stated she did not know. Williams stated she called the testing facility and spoke to them about how long a substance can remain in someone's hair. She agreed that a "hair follicle test can go

back 90 days." She stated she also understood that a body hair test could be positive for up to 12 months.

¶ 22        The trial court admitted into evidence a urinalysis drug test result from March 2024, which stated respondent had "presumptive positive" results for amphetamine and THC, but a "more specific alternative chemical method must be used in order to obtain a confirmed analytical result." Williams testified this test was ordered by DCFS. Respondent's counsel asked if she had followed up this test with a chemical test, and she stated she did not know what a chemical test was. She stated DCFS only ordered urine and hair follicle testing, and she ordered both kinds of tests throughout the case.

¶ 23        Williams stated that respondent attended substance abuse services during the nine-month period in question, but his attendance between October 2023 and April 2024 was inconsistent. He was also seeing a psychologist during that time and engaging in individual therapy, though his attendance was inconsistent. The parties stipulated that respondent was evaluated for substance abuse in July 2023. Between August 2023 and April 2024, he attended seven substance abuse services appointments and missed five.

¶ 24        After hearing arguments, the trial court took the matter under advisement.

¶ 25        On May 28, 2025, the trial court issued a written order, finding the State had met its burden of proving by clear and convincing evidence that respondent failed to make reasonable progress toward the return of the minor between July 6, 2023, and April 6, 2024. The court noted Williams testified that, as of April 2024, respondent's home was not suitable. The court also noted that, during the relevant period, respondent passed some drug tests but failed others. The court stated that respondent failed to complete parenting classes or any type of drug treatment. The court found that, approximately two years after removal, respondent was still struggling with

the conditions that brought L.T.P. into care and had not substantially fulfilled certain aspects of the service plan.

¶ 26    On June 9, 2025, the trial court held a hearing on the issue of whether termination of respondent's parental rights was in L.T.P.'s best interest. Williams testified that she had been L.T.P.'s caseworker since his case was opened two and a half years earlier. L.T.P. had been in his current foster placement for 9 to 10 months. He was five years old and attended preschool.

¶ 27    Williams testified that she had observed L.T.P. with his foster family. She stated that L.T.P.'s foster parents met all his needs, he called them "mom" and "dad," he went to them for comfort, and he appeared bonded with them. L.T.P. did not have any truancy issues in preschool and did not miss doctor's appointments. Williams stated she believed it was in L.T.P.'s best interest that he be adopted. She stated that his current foster parents were friends with respondent's adult daughter, and she believed they would be willing to continue facilitating a relationship between L.T.P. and his father and adult siblings as long as they believed it was in L.T.P.'s best interest.

¶ 28    Williams testified that there were initially concerns with the condition of respondent's home and his drug use. She stated L.T.P. was returned to respondent's care between November 2022 and June 2023. She stated respondent took him to doctor's appointments, enrolled him in speech therapy, and generally cared for him properly during that time. Williams had concerns about the state of respondent's home, but she stated respondent always kept a "watchful eye" on L.T.P. when she was there. She stated that DCFS had not referred L.T.P. and respondent for a bonding assessment or executed a placement review summary. She stated that L.T.P.'s visits with respondent went well, and L.T.P. was always happy to see respondent.

¶ 29    Respondent testified that he had a close bond with L.T.P. and gave numerous

examples illustrating this bond. Respondent testified that after the permanency goal was changed to substitute care pending determination on termination of parental rights, L.T.P. told him that he wanted to return to respondent's residence and that he missed him. Respondent testified he was able to provide L.T.P. with food, clothing, shelter, and healthcare. Respondent indicated that he continued to engage in services even after the goal change "because of that one percent chance that it may give me the chip over the top over the hill to give me my son back."

¶ 30    Respondent testified that L.T.P. was born in October 2019 and was taken into DCFS care upon his release from the hospital. Respondent went to prison from February 2020 until January 2021 for driving on a revoked license. L.T.P. was returned to respondent's care when he was released from prison and taken back into care of DCFS when the instant case was opened. Respondent testified that he had had issues with methamphetamine addiction since 2014, and he relapsed in 2023.

¶ 31    The trial court took the matter under advisement.

¶ 32    On June 10, 2025, the trial court entered a written decision, finding termination of respondent's parental rights was in L.T.P.'s best interest. The court stated it had considered the statutory best interest factors. The court found that respondent loved his son and had made improvements at times. However, the court stated that respondent had shown a lack of consistency and stability throughout the years. The court found respondent had been given multiple opportunities and a considerable amount of time to provide stability for L.T.P., but he "always fell short" of doing so. The court found L.T.P. needed permanency, and termination of respondent's parental rights was in his best interest. The court granted the State's motion to terminate respondent's parental rights and gave the State leave to submit an order incorporating the court's unfitness and best interest decisions to be reviewed and entered by the court.

¶ 33 On July 18, 2025, the trial court entered a written order terminating respondent's parental rights and appointing a guardian with the power to consent to adoption. This appeal followed.

¶ 34 II. ANALYSIS

¶ 35 On appeal, respondent argues that the trial court's determinations that he was unfit and that termination of his parental rights was in L.T.P.'s best interest were against the manifest weight of the evidence. The State contends, as a threshold matter, that we lack jurisdiction over the appeal because respondent cited the wrong supreme court rule in his notice of appeal.

¶ 36 A. Jurisdiction—Notice of Appeal

¶ 37 First, the State argues that we lack jurisdiction over this appeal. The State notes that respondent's notice of appeal cites Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017), which provides: "An appeal may be taken to the Appellate Court from an interlocutory order of court *** terminating parental rights or granting, denying or revoking temporary commitment in adoption proceedings commenced pursuant to section 5 of the Adoption Act [(750 ILCS 50/5 (West 2024))]." The State argues that Rule 307(a)(6) does not apply to the instant case because the termination proceeding in this case was commenced under the Juvenile Court Act rather than the Adoption Act. The State asserts that orders terminating parental rights in adoption proceedings are interlocutory (see *In re Adoption of D.*, 317 Ill. App. 3d 155, 160-61 (2000)), but termination orders entered in proceedings initiated under the Juvenile Court Act are final (see *In re A.H.*, 207 Ill. 2d 590, 595 (2003)).

¶ 38 The State argues that because the order terminating respondent's parental rights in this case was a final order rather than an interlocutory order, the appeal should have been filed

under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) rather than Rule 307(a)(6). The State further argues that because the notice of appeal "relied" on Rule 307(a)(6), the appeal should be dismissed for lack of jurisdiction. We disagree with the State's argument and find that we have jurisdiction over this appeal.

¶ 39    Initially, we note that there is conflicting authority on the question of whether an order terminating parental rights in a proceeding initiated under the Juvenile Court Act is properly considered an interlocutory order or a final order. As the State notes in its brief, our supreme court held in *A.H.*, that such an order is a final order. *A.H.*, 207 Ill. 2d at 595. The *A.H.* court stated:

> "An order terminating parental rights and appointing a guardian to consent to adoption is a final order because the specific permanency goal is achieved and there is no need for the issue of termination to be reevaluated under the [Juvenile Court] Act. Indeed, under the [Juvenile Court] Act, '[a]n order so empowering the guardian to consent to adoption deprives the parents of the minor of all legal rights as respects the minor and relieves them of all parental responsibility for him or her, and frees the minor from all obligations of maintenance and obedience to his or her natural parents.' 705 ILCS 405/2-29(2) (West 2002). It therefore sets the rights of the parent, who may then appeal." *Id.*

See *In re Lu. S.*, 2017 IL App (5th) 160482, ¶ 3 ("An order terminating parental rights is a final and appealable order.").

¶ 40    However, in its subsequent decision in *In re Haley D.*, 2011 IL 110886, ¶ 62, which involved the termination of parental rights in a case initiated under the Juvenile Court Act, our supreme court asserted:

> "It is well established that once there has been a finding of neglect and a child has been adjudged a ward of the court pursuant to the Juvenile Court Act, as occurred here, the proceedings by which parental rights are terminated are governed by the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2008). [Citations.]). Under the Adoption Act, orders terminating parental rights are nonfinal and interlocutory."

The court in *Haley D.* further noted that the respondent's appeal was brought under Rule 307(a)(6), which "specifically characterizes orders terminating parental rights as interlocutory in nature." *Id.* ¶ 63. The majority opinion in *Haley D.* did not address *A.H.*

¶ 41    In a special concurrence joined by Justice Garman, Justice Theis disagreed with the foregoing portion of the majority's analysis in *Haley D.*, stating that it "add[ed] uncertainty to an already complex area of law by confusing orders terminating parental rights entered in proceedings under the Juvenile Court Act with orders terminating parental rights entered in proceedings under the Adoption Act." *Id.* ¶ 103 (Theis, J., specially concurring, joined by Garman, J.). The special concurrence asserted that an order terminating parental rights entered in an adoption proceeding was interlocutory and did not become final until the judgment of adoption was entered, such that the dismissal of the adoption had the effect of setting aside the interlocutory termination order. *Id.* However, in proceedings under the Juvenile Court Act, termination orders are typically final, as their finality does not depend on whether the child is adopted. *Id.* The special concurrence also disagreed with the majority's position that Illinois Supreme Court Rule 307 (eff. Nov. 1, 2017) recognizes that orders terminating parental rights are interlocutory. *Haley D.*, 2011 IL 110886, ¶ 104. The special concurrence stated that Rule 307 does not make an order interlocutory; rather, it provides for the appeal from termination orders

which are, as a matter of law, interlocutory. *Id.* ¶ 104.

¶ 42　　　　The State does not address *Haley D.* in its brief, though it recognizes that this court in several cases has cited Rule 307(a)(6) as the basis for appellate jurisdiction in cases involving the termination of parent rights under the Juvenile Court Act. See *In re A.B.*, 2022 IL App (4th) 220758-U, ¶ 19; *In re J.M.*, 2022 IL App (4th) 220710-U, ¶ 19; *In re A.S.*, 2022 IL App (4th) 220611-U, ¶ 20. The State contends that the references to Rule 307 in the cases it cited were erroneous. While we find the position articulated by the State and the special concurrence in *Haley D.* to be compelling, we cannot ignore the majority decision in *Haley D.* See *Waxenberg v. Brown*, 299 Ill. App. 225, 234 (1939) ("It is the general rule that the latest expression of the Supreme Court is the law to be followed in other courts in similar cases."). We hope our supreme court will revisit this issue and resolve this apparent conflict in the future.

¶ 43　　　　However, we need not determine here whether a termination order in a proceeding initiated under the Juvenile Court Act is an interlocutory or a final order. Even if we assume the State is correct that respondent's counsel cited the wrong supreme court rule in his notice of appeal, such an error would not deprive us of jurisdiction. See *O'Banner v. McDonald's Corp.*, 173 Ill. 2d 208, 211 (1996); *Pnevmatikos v. Pappas*, 2025 IL App (1st) 230739, ¶ 36 ("[T]his court is not bound by the rule invoked in a notice of appeal, and we are not deprived of jurisdiction by an appellant's citation to the wrong rule therein.").

¶ 44　　　　In *O'Banner*, the appellant's notice of appeal incorrectly cited Rule 301 rather than Rule 304(a). *O'Banner*, 173 Ill. 2d at 211. Our supreme court held that this error was "of no consequence." *Id.* The court stated:

> "Nothing in our rules requires a notice of appeal to even mention whether review
> is sought under Rule 301 or 304(a). What is important is that the notice specify

'the judgment or part thereof or other orders appealed from and the relief sought from the reviewing court' [citation] so that the successful party is advised of the nature of the appeal [citation]. There is no question that this requirement was satisfied here. Accordingly, O'Banner's citation to the wrong rule was nothing more than harmless surplusage. His notice of appeal was sufficient to invoke the appellate court's jurisdiction." *Id.*

¶ 45 Here, respondent's notice of appeal, which was filed August 15, 2025, identified the orders or judgments he wanted to appeal as being entered on July 18, 2025, and December 13, 2024. He stated the relief requested was reversal or vacatur of the trial court's judgment and remand for any hearings that are still required. Thus, it was clear from respondent's notice of appeal that he sought to appeal the trial court's judgment entered July 18, 2025, terminating his parental rights. Even if the State is correct that this order was a final order appealable under Rule 301 rather than an interlocutory order under Rule 307(a)(6), respondent's notice of appeal was timely and sufficiently identified the judgment he sought to appeal and the relief sought. See Ill. S. Ct. R. 303 (eff. July 1, 2017). The fact that it may have been filed under the wrong rule does not deprive this court of jurisdiction. See *O'Banner*, 173 Ill. 2d at 211.

¶ 46 We reject the State's reliance on *Santella v. Kolton*, 393 Ill. App. 3d 889 (2009), and *Legacy Re, Ltd. v. 401 Properties Ltd. Partnership*, 2023 IL App (1st) 220855, in support of its argument that respondent's citation of the wrong supreme court rule deprives this court of jurisdiction. In both *Santella* and *Legacy*, the appellants improperly sought to appeal permanent injunction orders under Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017), which only applies to temporary, interlocutory injunctive orders that preserve the status quo pending a decision on the merits. *Santella*, 393 Ill. App. 3d at 903-04; *Legacy*, 2023 IL App (1st) 220855,

¶ 19. In both cases, the courts dismissed the appeals for lack of jurisdiction. *Santella*, 393 Ill. App. 3d at 904-05; *Legacy*, 2023 IL App (1st) 220855, ¶ 26.

¶ 47 However, the dismissals of the appeals in *Santella* and *Legacy* were not merely due to the appellants' citation of an inapplicable supreme court rule in their notices of appeal. Rather, the appeals were dismissed because they cited an inapplicable supreme court rule as the basis for appellate jurisdiction *and* the orders at issue were not appealable under any other rule. In *Santella*, the court found that the permanent injunction order at issue could not be appealed under Rule 301 because other counts of the complaint still remained pending in the trial court, and the order was not appealable under Rule 304(a) because the trial court had not made the requisite finding that no just reason existed to delay the appeal. *Santella*, 393 Ill. App. 3d at 904-05. Similarly, in *Legacy*, which involved a mortgage foreclosure proceeding, the court found that the judgment at issue would not become final and appealable until the trial court entered an order approving the sale of the subject property and directing the distribution. *Legacy*, 2023 IL App (1st) 220855, ¶ 24. The court in *Legacy* held that while the order the appellant sought to appeal was final as to the matters it adjudicated, it was not appealable because the trial court still had to enter subsequent orders. *Id.*

¶ 48 In the instant case, on the other hand, the State asserts that the termination order at issue, while not an interlocutory order appealable under Rule 307(a)(6), was a final, appealable order under Rule 301. Thus, even if the State is correct that respondent cited the wrong supreme court rule in his notice of appeal, we would have jurisdiction pursuant to Rule 301. See *O'Banner*, 173 Ill. 2d at 211.

¶ 49 B. Unfitness

¶ 50 Respondent argues the trial court's finding that he was unfit was against the

manifest weight of the evidence. Respondent contends the evidence showed that he engaged in substance abuse counseling and his other services. He also argues the evidence showed he was taking a medication that could cause drug tests to show positive results for amphetamines or methamphetamine, and he contends the evidence at the unfitness hearing "called into question the validity of [his] drug test results and whether the positive tests were the result of [his] prescription or use of methamphetamine." Respondent also contends that Williams displayed a lack of training in how to interpret the drug test results, and she did not know what levels of methamphetamine or amphetamines would be "acceptable" for an individual taking Adderall.

¶ 51    The process for the involuntary termination of parental rights is governed by the Juvenile Court Act and the Adoption Act. *In re M.I.*, 2016 IL 120232, ¶ 19. Section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)) sets forth a two-step process for the involuntary termination of parental rights. See *M.I.*, 2016 IL 120232, ¶ 20. The trial court must first find, by clear and convincing evidence, that a parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 5/1(D) (West 2024)). 705 ILCS 405/2-29(2) (West 2024); *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Second, if the court finds the parent to be unfit, it next considers whether termination of parental rights is in the child's best interest. 705 ILCS 405/2-29(2) (West 2024).

¶ 52    Relevant here, section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)) provides that a ground of unfitness is "[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act." The statute further provides that if a service plan has been established, " 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially

fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication." *Id.*

¶ 53 "Reasonable progress, which is assessed under an objective standard, exists when a parent's compliance with the service plan and the trial court's directives is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody." (Emphasis in original and internal quotation marks omitted.) *In re Baby Boy*, 2025 IL App (4th) 241427, ¶ 65. Our supreme court has held:

> "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001).

¶ 54 A trial court's finding of unfitness will not be reversed unless it is against the manifest weight of the evidence. *M.I.*, 2016 IL 120232, ¶ 21. This is because the trial court "is in the best position to make factual findings and to assess the credibility of witnesses." *In re M.H.*, 196 Ill. 2d 356, 361 (2001). "A court's decision regarding a parent's fitness is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent." (Internal quotation marks omitted.) *M.I.*, 2016 IL 120232, ¶ 21. "Each case concerning parental unfitness is *sui generis*, unique unto itself." *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990).

¶ 55 We find that the trial court's determination that respondent was unfit due to his failure to make reasonable progress toward L.T.P.'s return during the nine-month period from

July 6, 2023, and April 6, 2024, was not against the manifest weight of the evidence. The State's evidence showed that L.T.P. was removed from respondent's custody in June 2023 due to respondent's drug use and the conditions of his home. Williams testified that, during the nine-month period from July 6, 2023, to April 6, 2024, respondent's residence was cluttered, and the ceiling was collapsing in the living room. At one point, the only running water in the residence was in the shower. Outdoors, there was "junk everywhere," including "huge piles" of scrap wire and metal, cars, mowers, and tractors. Williams indicated L.T.P. could be hurt in this environment if not properly supervised. While respondent testified that he cleaned up everything he was asked to, Williams testified that the issues with the residence had not been corrected at the end of the nine-month period in April 2024.

¶ 56　　　　The evidence also showed that respondent tested positive for methamphetamine on several occasions during the nine-month period at issue, and Williams testified that his levels were rising at the end of the period. While respondent contends that Williams's testimony demonstrated that she lacked education and training as to the proper interpretation of drug test results, the trial court was in the best position to assess her credibility. See *M.H.*, 196 Ill. 2d at 361. Though respondent was engaged in substance abuse services during the relevant period, the evidence showed his attendance was inconsistent.

¶ 57　　　　While respondent testified that he had not used methamphetamine since June 2023 and that Adderall could cause a drug test to be positive for methamphetamine, the trial court was not required to find his testimony credible or assign great weight to it. Notably, though respondent was permitted to testify that his "Google research" showed that Adderall could cause a drug test to be positive for methamphetamine, he had no expertise in this area. Also, the evidence showed he tested positive for methamphetamine even before he started taking Adderall

and that he gave his caseworker several other excuses for his positive test results.

¶ 58                                    C. Best Interest

¶ 59        Respondent argues that the trial court's finding that termination of his parental rights was in L.T.P.'s best interest was against the manifest weight of the evidence. Respondent argues that "[t]he State's limited evidence only touched on a few of the best interest factors and fell far short of establishing even by a preponderance of the evidence that termination of parental rights was in the child's best interest." Respondent contends that the evidence showed he had a close bond with L.T.P., visited L.T.P. regularly throughout the case, and continued to engage in services even after the permanency goal was changed to substitute care pending determination on termination of parental rights.

¶ 60        In a termination of parental rights proceeding, if the trial court finds a parent to be unfit, the court then determines whether the State has proven by a preponderance of the evidence it is in the best interest of the minor that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 352, 366 (2004). Once a parent has been found unfit, "the focus shifts to the child." *Id.* at 364.

> "The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated. Accordingly, at a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." (Emphases in original.) *Id.*

¶ 61        In determining whether termination of parental rights is in the minor's best interest, the trial court is to consider the following factors in the context of the child's age and developmental needs:

> "(a) the physical safety and welfare of the child, including food, shelter,

health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized

guardianship or through adoption." 705 ILCS 405/1-3(4.05) (West 2024).

¶ 62    "The trial court's best-interest determination will not be disturbed on appeal unless it is against the manifest weight of the evidence." *Baby Boy*, 2025 IL App (4th) 241427, ¶ 74. "We afford great deference to the [trial] court's determination, as it is in the best position to view the witnesses and judge their credibility." *Id.*

¶ 63    We find the trial court's determination that termination of respondent's parental rights was in L.T.P.'s best interest was not against the manifest weight of the evidence. The evidence at the best-interest hearing showed that L.T.P.'s sense of attachments, physical welfare, and need for permanence weighed in favor of termination of parental rights. The evidence showed L.T.P. was bonded with his foster parents, called them "mom" and "dad," and they provided for all his needs. The caseworker stated she believed L.T.P.'s foster parents would be willing to continue to facilitate a relationship between L.T.P. and respondent as long as they believed it was in L.T.P.'s best interest. Though there was evidence that L.T.P. and respondent shared a bond, respondent had demonstrated an inability to consistently provide adequate care for L.T.P. due to the unsafe condition of his home and his drug use. The evidence also showed that five-year-old L.T.P. had been taken into DCFS custody three times since his birth in 2019.

¶ 64                       III. CONCLUSION

¶ 65    For the reasons stated, we affirm the trial court's judgment.

¶ 66    Affirmed.

***In re L.T.P.*, 2026 IL App (4th) 250856**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Macoupin County, No. 22-JA-26; the Hon. Joshua Aaron Meyer, Judge, presiding. |
| **Attorneys for Appellant:** | Sean E. Rees, of Carlinville, for appellant. |
| **Attorneys for Appellee:** | Jordan J. Garrison, State's Attorney, of Carlinville (Patrick Delfino and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |